## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KLCG PROPERTY, LLC, and<br>GURNEE PROPERTY, LLC, | Case No. 09-14418 (___) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF STEVEN A. NERGER
## IN SUPPORT OF FIRST DAY MOTIONS

STATE OF WISCONSIN    )
                             )   ss.
COUNTY OF DANE        )

Steven A. Nerger, hereby declares as follows:

1.     I am the proposed Chief Restructuring Officer of KLCG Property, LLC and of Gurnee Property, LLC. I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records.

2.     On December 16, 2009, (the "Petition Date"), KLCG Property, LLC and Gurnee Property, LLC (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") (collectively, the "Chapter 11 Cases").

3.     The Debtors are operating their businesses and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

4.     In order to enable the Debtors to minimize any adverse effects of the commencement of the Chapter 11 Cases on their business operations, the Debtors have

requested various types of relief in certain "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things, (i) providing for post-petition financing, (ii) maintaining employee morale, (iii) ensuring the continuation of the Debtors' cash management system and other business operations without interruption, (iv) ensure Debtors' ability to obtain the services and inventory necessary to operate; (v) provide continuation of utilities; and (v) establish administrative procedures to facilitate a smooth transition into chapter 11.

5. I submit this declaration (the "Declaration") in support of the First Day Motions. I am familiar with the contents of the First Day Motions, and I believe that the relief sought in each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (ii) constitutes a critical element in making these Chapter 11 Cases successful, and (iii) is in the best interest of the Debtors and their estates.

6. Due to (i) Debtors' inability to pay its obligations as they become due as well as their financially burdensome capital structure (including debt and subordinated debt), (ii) the Debtors' need to reduce debt load and interest expenses, and (iii) the Debtors' mounting concerns regarding the potential deterioration of their businesses—and accompanying degradation in value—stemming from rumors in the marketplace about the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would be best maximized and preserved through a sale process (the "Sale").

7. Therefore, the Debtors intend to complete by the end of March of 2010 a going-concern Sale of their businesses and assets (the "Assets") to the Debtors' first secured lender, Dougherty Funding, LLC as the stalking horse bidder (the "Stalking Horse

Bidder") pursuant to an asset purchase agreement and commenced these Chapter 11 Cases to implement the Sale pursuant to Section 363 of the Bankruptcy Code, subject to a competitive Sale process and the solicitation of higher and/or otherwise better offers.

8. The Debtors believe that unless the Sale is expeditiously consummated, whether to the proposed Stalking Horse Bidder or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration. Consequently, the Debtors have determined that it is in the best interest of their estates, creditors and other parties-in- interest to move forward with the Sale process.

9. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of each of the Debtors.

10. Part I of this Declaration provides an overview of the Debtors' history and business operations, capital structure, the Debtors' prepetition indebtedness, and the circumstances surrounding the commencement of the Chapter 11 Cases. Part II of the Declaration sets forth the relevant facts in support of each of the First Day Motions.

## PART I

### Overview of Debtors' History and Business Operations

11. On the Petition Date, the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to

068913.1001

continue to operate their businesses and manage their property as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     No request for appointment of a chapter 11 trustee or examiner has

been made and, as of the date hereof, no official committee has been appointed.

13.     KLCG Property, LLC ("KLCG Property") is a Delaware single

member limited liability company and wholly owned subsidiary of KeyLime Cove of

Gurnee, LLC, a Delaware limited liability company ("Gurnee"). Gurnee is managed by

KeyLime Cove Resorts, LLC, a Delaware limited liability company formed on October 13,

2005 ("Resorts").

14.     KLCG Property was organized in Delaware on October 13, 2005 for

the purpose of constructing, owning and operating a 414-room destination resort hotel, indoor

water park and conference center located north of Chicago in Gurnee, Illinois. The resort

hotel and indoor water park are hereinafter referred to as the "Water Park."

15.     The Water Park is located on 30 acres at the northeast corner of

Interstate 94 and Grand Avenue (Illinois Route 132) (the "Land"), across from Six Flags

Great America Theme Park ("Six Flags") and Gurnee Mills Mall in Gurnee, Illinois. It is

intended to fill demand for a drive-to, year-round destination resort with significant water

amenities that is not dependent on weather.

16.     Gurnee Property, LLC, an Illinois limited liability company ("Gurnee-

Property"), a wholly owned subsidiary of Resorts, is the owner of a 59.03% tenants-in-

common interest in the Land and the remaining tenants-in-common interest of 40.97% is

owned by KLCG Property.

DB02:9032807.2     068913.1001

17. Resorts owns all of the common units of Gurnee-Property and Gurnee, and is entitled to certain distributions from Gurnee-Property and Gurnee under the Operating Agreements of those entities.

18. KLCG Property leases the Land from Gurnee-Property pursuant to a land lease dated December 22, 2006 (the "Land Lease").

19. Gurnee is the second largest tourist destination in Illinois, second only to downtown Chicago, and draws from the metropolitan markets of Milwaukee and Chicago, which have a combined population of over 12 million people. Six Flags and Gurnee Mills Mall collectively draw millions of visitors annually.

20. The Water Park offers outstanding accommodations with meeting space, confectionary, concessions, restaurant, bar, retail, gaming arcade, boutique gift shops, spa, and an indoor water park.

21. The Water Park was designed to accommodate the following travel and leisure trends: (i) frequent, short breaks to regional destinations, which are becoming increasingly popular; (ii) vacations with extended family and friends; (iii) travelers seeking offerings that provide unique experiences and great value; (iv) people seeking destinations that give them a place to celebrate, bond, relax and create lasting memories; and (v) providing people with new travel experiences.

22. Resorts owns, subject to the interests of KLCG Property as licensee under that certain license Agreement between Resorts and KLCG Property, all right title and interest in the concept of the Water Park, other than the intellectual property related to the restaurants at the Water Park, which are owned by DWA Holdings, LLC and discussed below.

5

23. DWA Holdings, LLC owns all of the right, title and interest in the intellectual property related to the restaurants at the Water Park, namely "Anderson's Old Fashioned Ice Cream Parlor and Eatery" and "The Crazy Toucan's Margarita Hut."

24. The Water Park is currently managed by S&L Hospitality, LLC a Wisconsin limited liability company ("S&L"), pursuant to a Management Agreement dated September 15, 2008. In consideration of the management services to be provided by S&L, KLCG Property pays S&L: (i) a "Management Fee" of 3% of gross revenues for each calendar month, (ii) an "Accounting Fee" of $6,210 per month, and (iii) 10% of the gross operating profit over the annual budget, capped annually at 1% of gross revenues.

25. S&L was formed on July 22, 2004 as a privately held hotel development and management company. It employs nearly 500 employees and manages hotels throughout the United States ranging in size from limited service properties to full service hotels with restaurants, lounges, and meeting and banquet space. S&L has prior experience developing and/or managing more than $800 million in hotels and resorts, indoor water parks, high-end spas and a combined 92,000 square-feet of conference and meeting space. S&L's corporate team is comprised of hospitality-industry experts in a range of specialty fields including development, purchasing, operations, human resources, sales, marketing, public relations, and accounting.

26. S&L acts as agent for KLCG Property in contracting to provide the services and inventory necessary for KLCG Property to operate the Water Park. S&L employs and provides the employees that work at the Water Park.

DB02:9032807.2 068913.1001

## **Existing Indebtedness**

27.    The Water Park was constructed in 2007-2008 at a cost of approximately $135,700,000. The Water Park was originally financed by the proceeds from (i) an intercompany loan in the original principal amount of $28,300,000 (the "2006 Intercompany Loan") from Gurnee secured by a second mortgage on the Water Park, (ii) a capital contribution of at least $13,811,000 from Gurnee to KLCG Property, and (iii) a Construction Loan in the original principal amount of $89,500,000 (the "Original Construction Loan") made by BankFirst, a South Dakota State banking corporation, as agent, for and on behalf of over 60 Participant Lenders.  Dougherty Funding LLC (the "Lender") is the successor Agent to BankFirst.

28.    KLCG Property, as borrower, and Lender are parties to that certain Loan Agreement dated as of December 29, 2006 (as amended, restated, supplemented or modified from time to time, the "Loan Agreement") pursuant to which Lender agreed to, among other things, make available to KLCG Property certain credit facilities in the form of the Original Construction Loan and the Line of Credit.

29.    KLCG Property, as borrower, and Lender are parties to that certain Security Agreement dated December 29, 2006 (as amended, restated, supplemented or modified from time to time, the "Security Agreement") pursuant to which KLCG Property granted Lender a security interest in all of KLCG Property's real and personal property, including without limitation all rights under the Water Park Documents, the Village Documents and the Subordinated Debt Documents.[2]

---

[2] Project Documents, Village Documents and Subordinated Debt Documents are each defined in the

DB02:9032807.2                                                                                                    068913.1001

30.  KLCG Property, as borrower, and Lender are parties to that certain Construction Note, dated December 29, 2006 in the amount of $89,500,000 (the "Original Construction Loan"). The Original Construction Loan enabled KLCG Property to pay the costs incurred in the acquisition of the Land and the development, construction and financing of the Water Park. The Original Construction Loan is secured by the Mortgage[3], the Assignment of Rents[4], the Guaranties,[5] and the other Loan Documents[6] (other than all documents or instruments respecting the cash collateral pledged by Resorts).

31.  Under the terms of the Original Construction Loan, KLCG Property is required to make payments as follows: (i) accruing interest shall be due and payable on the 29th day of each month commencing January 29, 2007 and continuing thereafter until the one year anniversary of the Conversion Date[7] (i.e. May 29, 2009); (ii) the principal balance and accruing interest shall be paid in equal monthly installments in an amount sufficient to fully

---

Loan Agreement.

[3] That certain Construction Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated as of December 29, 2006, joined by Gurnee-Property and delivered to Lender respecting the real and personal property.

[4] That certain Assignment of Rents, Lease(s), Profits and Revenues dated December 29, 2006 executed by KLCG Property, joined by Gurnee-Property and delivered to Lender respecting the real and personal property.

[5] The Guaranty Agreements executed by Gurnee, David W. Anderson and Kathryn W. Anderson and delivered to Lender.

[6] Loan Documents is defined in the Loan Agreement to include the Loan Agreement, the Original Construction Loan, the Line of Credit, the Mortgage, the Assignment of Rents, the Security Agreement, the Intellectual Property Security Agreement, the Assignment of Management Agreement, the Assignments of Contract Documents, the Replacement Reserve Agreement, the Assignment of Village Documents, the Pledge Agreements, the Reserve Pledge Agreement, the Financing Statements, the Subordination Agreement, the Assignment(s) of License Agreement(s), the Guaranties, the Disbursing Agreement, the Certification of USA Patriot Act Compliance, the Environmental Indemnity, and the Owner-Inspecting Engineer Agreement.

[7] The Conversion Date is defined in the Loan Agreement as May 29, 2008.

amortize the outstanding principal balance of the Original Construction Loan plus accrued interest thereon at the interest rate then in effect over a 25-year period ending on the 26th anniversary of the Conversion Date, which shall be due and payable on the 29th day of each month commencing with the first month following the one year anniversary of the Conversion Date; and (iii) the entire remaining unpaid principal balance plus all accrued interest thereon shall be due and payable in full on the earlier of (a) if KLCG Property fails to timely pay the Extension Fee[8] or if a Default[9] or Event of Default[10] then exists, December 29, 2011, and (b) if KLCG Property timely pays the Extension Fee and if no Default or Event of Default then exists, June 29, 2012.

32.     On February 5, 2009, KLCG Property received notice from the Lender that KLCG Property was in default under the Original Construction Loan by failing to make interest payments when due.  KLCG Property and the Lender entered into negotiations with respect to an agreement to forbear; however, no written agreement of forbearance was agreed upon.  As a result of the defaults by KLCG Property under the Original Construction Loan and the Loan Agreement, the Original Construction Loan has matured.  As of December, 2009, the balance due on the Original Construction Loan was approximately $89,500,000.

33.     KLCG Property, as maker, and Gurnee are parties to that certain Subordinated Inter-Company Note, dated December 29, 2006 in the amount not to exceed $36,000,000 (the "2006 Intercompany Loan").  The 2006 Intercompany Loan enabled KLCG

---

[8] Extension Fee is defined in the Loan Agreement as a fee equal to 0.05% of the then aggregate outstanding principal amount of the Notes, due and payable on or before December 29, 2011.

[9] Default is defined in the Loan Agreement as any event which, with the giving of notice to KLCG Property or lapse of time, or both, could constitute an Event of Default.

[10] Event of Default is defined in Section 11.1 of the Loan Agreement.

DB02:9032807.2                                                        068913.1001

Property to pay the costs incurred in the acquisition of the Land and the development, construction and financing of the Water Park. The 2006 Intercompany Loan is secured by a second mortgage lien on the Land, second assignment of leases and rents relating to the Land and second lien security interest in all contracts, agreements, trademarks, licenses, goods, equipment, accounts, furniture, fixtures and inventory, hotel revenues, and all other tangible and intangible personal property located on or used in connection with the Land.

34.     The 2006 Intercompany Loan is expressly subordinate to the payment of the Original Construction Loan and the Line of Credit pursuant to an Intercreditor and Subordination Agreement by and between Lender and Gurnee, dated December 29, 2006.

35.     Preferred Equity Membership Units were purchased from Gurnee by investors in the aggregate amount of approximately $13,811,000.

36.     The 2006 Intercompany Loan is *pari passu* with the rights of the Land Lease pursuant to an Intercreditor Agreement by and between Gurnee and Gurnee-Property, dated December 29, 2006.

37.     KLCG Property is in default of the 2006 Intercompany Loan for failure to make payments when due. As of December, 2009, the balance due on the 2006 Intercompany Loan was approximately $28,330,000.

38.     KLCG Property and Gurnee-Property are parties to a Land Lease (as described herein). KLCG Property is in default under the Land Lease for failure to pay the lease payments. As of December, 2009, the balance due on the Land Lease was approximately $4,000,000 (the "Land Lease Debt.")

10

39.     KLCR Investors, LLC, DWA Holdings LLC and CBF, LLC previously made unsecured loans to KLCG Property that were used for either working capital or to make debt service payments on the Original Construction Loan. (collectively, the "Investor Loans.") The outstanding balance on the Investor Loans as of December 2009 is approximately $4,300,000.

## Events Leading to Chapter 11 Filing

40.     KLCG Property incurred a net loss for the years ending on December 31, 2007 and December 31, 2008, and expects to incur a net loss for the year ending on December 31, 2009.

41.     The recent economic downturn has decreased consumer demand for destination resorts and water parks. The nation as a whole is experiencing a downturn in the entertainment, travel and vacation industries, and the Water Park, as a family entertainment resort, has also experienced this downturn. Furthermore, regional economic difficulties in southern Michigan, northern Indiana and the surrounding areas may have had a disproportionately negative impact on the occupancy rate at the Water Park.

42.     The Water Park is located directly next to Six Flags, a family-friendly amusement park, and Gurnee Mills Mall, a large shopping mall. The Water Park relies on these two family-friendly attractions to attract visitors to Gurnee, Illinois, and hence to the Water Park. Historically, due in large part to the location of these two large attractions, Gurnee, Illinois has drawn millions of visitors annually, making it the second largest tourist destination in Illinois. The Water Park's success is intricately intertwined with the success of

DB02:9032807.2                                                    068913.1001

these two attractions. Six Flags recently filed for bankruptcy protection, and while it continues to operate an amusement park at its Gurnee, Illinois location, the reduction of visitors to Six Flags has necessarily impacted and limited the amount of families who travel to Gurnee, Illinois. The reduction in the number of visitors, and families in particular, who visit Gurnee, Illinois has limited the amount of potential guests who may choose to stay at the Water Park.

43. Both the economic downturn and the significant reduction of spending in the entertainment, travel and vacation industries in Gurnee, Illinois have contributed to the Water Park's decreased revenues.

44. The decreased revenues created a situation where KLCG Property was no longer able to service its debt.

45. KLCG Property's failure to service the debt on its obligations constitutes a default under the Original Construction Loan, the 2006 Intercompany Loan, and the Land Lease. A default under the Original Construction Loan entitles the Lender to foreclose its first mortgage on the Water Park. The businesses contained within the Water Park are the sources of revenue for KLCG Property, and if the Land is foreclosed, KLCG Property will be left without any source of revenue.

46. In addition, if KLCG Property's source of revenue is foreclosed, KLCG Property will be unable to service the debt on the Land Lease. The Land Lease is Gurnee-Property's sole source of revenue. If KLCG Property is unable to service the debt on the Land Lease, then Gurnee-Property will be left without any source of revenue.

DB02:9032807.2          068913.1001

47.     KLCG Property's business model and operations are extremely valuable as a going concern and valuable to their various constituents, including, without limitation, their customers, vendors and creditors, and the employees of S&L. Debtors have not been able to overcome the ramifications of the downward trend in the U.S. economy and are unable to repay their secured debt in full at this time. These circumstances have created unavoidable consequences. A confluence of all of the events described above led the Debtors to file a voluntary chapter 11 petition to preserve their collateral and reorganize their respective businesses.

## PART II

## First Day Motions[11]

48.     Concurrently with the filing, the Debtors have filed a number of First Day Motions, consisting of both procedural motions and motions related to the Debtors' business operations. The Debtors believe that approval of each of the First Day Motions is a vital element in their Chapter 11 efforts and is necessary to ensure a smooth transition into Chapter 11 with minimal disruption to its business operations. I reviewed each of the First Day Motions and I believe that the relief requested therein is critical to the Debtors' ability to make these Chapter 11 Cases successful. Factual information with respect to each First Day Motion is provided below and in each First Day Motion.

49.     I participated in preparing and have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe that the facts set forth therein are true and correct. Such representation is

---

[11] All capitalized terms not otherwise defined in this section, shall have the meanings ascribed to them in their respective motions.

DB02:9032807.2                                                          068913.1001

based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

50. The relief sought in the First Day Motions will minimize the adverse effects of the instant Chapter 11 cases on the Debtors and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate effectively in chapter 11 as debtors in possession.

51. As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met and that the Debtors suffer no immediate and irreparable harm. I personally participated in the analysis that led to the creation of each of the First Day Motions and assisted in the drafting and development of the relief requested therein. At all times the Debtors' management and professionals remained cognizant of the limitations imposed on debtors-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' immediate operability.

A. **Debtors' Motion for Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing the Joint Administration of Cases.**

52. I believe that the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor. Each Debtor has a tenant in common ownership interest in the Land. Under these circumstances, I believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes only. The

DB02:9032807.2      068913.1001

Debtors further believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

B.   **Debtors' Motion for Order Pursuant to 28 U.S.C. § 156(c) and Bankruptcy Rule 2002 Authorizing Employment and Retention of The Garden City Group, Inc. as Claims, Noticing and Balloting Agent.**

53.   By this Motion, the Debtors seek entry of an order authorizing the Debtors to retain The Garden City Group, Inc. ("GCG") as their claims, notice and balloting agent ("Agent"). Upon information and belief, GCG is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe GCG is well qualified to serve as Agent in these cases. The employment of GCG will also provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases leaving the Debtors' management and professionals to focus on the Debtors reorganization.

C.   **Debtor's Motion for an Order (i) Authorizing and Approving Continued Use of Cash Management System, (ii) Authorizing Use of Prepetition Bank Accounts and Business Forms, and (iii) Waiving the Requirements of 11 U.S.C. § 341(b) on an Interim Basis.**

54.   By this Motion, the Debtor KLCG Property seeks entry of an order (i) authorizing the continued use of its existing cash management system, (ii) authorizing the continued use of their existing bank accounts and business forms, and (iii) authorizing their deposit practices and waiving the requirements of section 345(b) in connection therewith on an interim basis. In connection with this relief, the Debtor respectfully requests a waiver of certain of the operating guidelines established by the Office of the United States Trustee that

15

requires the Debtor to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationery.

55.    As described in detail in the Motion, the Debtor maintains a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System"). To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these chapter 11 proceedings, it is vital to the Debtors that KLCG Property maintains its Cash Management System.

56.    KLCG Property maintains current and accurate accounting records of daily cash transactions and submits that maintenance of this Cash Management System is vital to prevent undue disruption to the Debtor's business operations while protecting the Debtor's cash for the benefit of the estates. It is critical that the Debtor be able to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate its large and complex business operations. Substantially disrupting its current cash management procedures would impair the Debtor's operations and ability to optimize their business performance.

D.    **Debtors' Motion for Interim and Final Orders Pursuant to Sections 366 and 105(a) of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services to the Debtors; (ii) Deeming Utility Providers Adequately Assured of Future Performance; and (iii) Establishing Procedures to Determine Requests for Adequate Assurance of Payment.**

57.    By this Motion, and to ensure continued provision of utility services (the "Utility Services") to the Debtors' various locations, the Debtors seek entry of an order prohibiting utility companies (the "Utility Companies") from terminating services on account of pre-petition invoices, deeming the Utility Companies to be adequately assured of future payment, and establishing procedures to determine additional adequate assurance. The

DB02:9032807.2

068913.1001

Debtors propose to establish a segregated account into which the Debtors will deposit a sum equal to half of the Debtors' estimated monthly costs for Utility Services (collectively, the "Utility Deposit") and, additionally, have proposed procedures to address any request made by the Utility Companies for additional adequate assurance.

58.     Any disruption of Utility Services at the Debtors' business locations would cause irreparable harm to the Debtors' business operations and their estates. The successful operation of the Debtors' businesses requires that the Utility Services be provided on a continual and uninterrupted basis. The Debtors have several accounts with Utility Companies and have established a good payment history with virtually all of their Utility Companies. To the best of the Debtors' knowledge, they have no defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices. However, any disruption of Utility Services could have a significant impact on the Debtors' business operation, revenues, customers and employees of S&L. Moreover, the Debtors' debtor-in-possession credit facility will afford the Debtors sufficient liquidity to pay for post-petition utility services.

E.      **Debtors' Motion for Order Pursuant to Sections 105(a), 363(b), 541, and 507(a)(8) of the Bankruptcy Code Authorizing (i) Payment of Prepetition Sales, Use and Franchise Taxes and Certain Other Government Charges and (ii) Financial Institutions to Process and Cash Related Checks and Transfers.**

59.     By this Motion, the Debtors request authorization (but not direction) to pay certain Taxes and Fees to various federal, state, county and city taxing and licensing authorities (singularly, the "Authority", collectively, the "Authorities"). The Debtors seek authority to pay any Taxes that were accrued prepetition but were not in fact paid or processed prepetition, or were paid prepetition in an amount less than is actually owed, or to

the extent any such payments made prepetition were rejected, lost or otherwise not received in full by any Authority. Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the filing, which the Debtors seek authority to pay pursuant to this Motion. Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

60.     The Debtors estimate that outstanding prepetition liabilities owing to the various Authorities for Taxes and Fees (exclusive of Property Taxes) will not exceed approximately $260,000, and that Property Taxes are approximately $835,000. Some, if not all, of the Authorities may initiate an audit of the Debtors if the Taxes are not paid on time. Such audits will unnecessarily divert the Debtors' attention away from the reorganization process and result in unnecessary expenses. Moreover, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, seek payment from the Debtors' directors and officers and pursue other remedies that will materially and immediately harm the estates. Moreover, many of the outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities. Therefore, such funds do not constitute property of the estate and could not otherwise be used by the estates.

61.     I believe that the Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business and thus harm these reorganizations to the detriment of all constituents. Additionally, any

attempts to collect the Taxes from the Debtors' officers and directors have the potential to divert the attention of those individuals away from the reorganization process.

F. **Debtors' Motion for Order Pursuant to Sections 105 and 363 of the Bankruptcy Code Authorizing Debtors to Honor or Pay Prepetition Amounts Due under the Customer Programs and Granting Related Relief.**

62. Pursuant to this Motion, the Debtor seeks authority to continue honoring its Customer Programs. The Debtor's business is dependent upon the loyalty and confidence of its customers. The continued support of this constituency is absolutely essential to the Debtor's ability to preserve and maximize the value of their businesses for the benefit of their stakeholders. Any delay in honoring or paying various obligations relative to the Customer Programs will severely and irreparably impair the Debtor's customer relations at a time when the loyalty and support of its customers are extremely critical. Indeed, such failure to honor Customer Programs could destroy goodwill built over the years with respect to many of the Debtor's longstanding relationships. In addition, the failure to honor certain obligations relative to the Customer Programs may result in customers recovering these amounts in any event, or attempting to recover these amounts, through setoff or recoupment. By contrast, honoring these prepetition obligations will require a reasonable expenditure of estate funds and will assist the Debtors in preserving their key customer relationships to the benefit of all stakeholders

63. Accordingly, to preserve the value of its estate, the Debtor must be permitted, in its sole discretion, to continue honoring or paying all obligations with respect to the Customer Programs without interruption or modification. In addition, to provide necessary assurances to the Debtor's customers on a going-forward basis, the Debtor requests authority, in its sole discretion, to continue honoring or paying all obligations to customers

19

that arise from and after the Petition Date under the Customer Programs in the ordinary course of the Debtor's businesses.

G. **Debtors' Motion for Authorizing The Funding Of Debtors' Payroll Account Pursuant To The Hotel Management Agreement Dated September 15, 2008 With S&L Hospitality, LLC.**

64. Debtors have a management contract with S&L in which S&L provides the employee services, management, and the day-to-day operations of the Debtor's business. KLCG Property is obligated to pay the expenses related to all employees hired by S&L to perform services for Debtors' benefit. For the reasons detailed in the motion, it is necessary to pay the costs related to these pre-petition services.

H. **Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing Incurrence by the Debtors of Post-petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and with Administrative Super priority; (II) Granting Liens; (III) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. Section 363 and Providing for Adequate Protection; (IV) Modifying the Automatic Stay**

65. By this Motion, the Debtors seek entry of an order (a) authorizing the Debtors to borrow up to $2,800,000 from Dougherty Funding, LLC on a secured basis pursuant to the terms of the Motion; (b); authorizing Debtors to obtain such post-petition financing and incur post-petition indebtedness, which financing and indebtedness due and owing by Debtors to Dougherty Funding, LLC shall (i) pursuant to 346(c)(1) of the Bankruptcy Code, have priority over any and all administrative expenses of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code, and (ii) pursuant to § 364(d)(1) of the Bankruptcy Code, be secured by first-priority lien on and security interest in property described in the Motion; and (c) authorizing Debtors to execute a security agreement, loan agreement and such other documents, instruments and agreements as are necessary to evidence the obligation to repay the advances made by Dougherty Funding, LLC pursuant to

this Motion and to grant and perfect a lien on the pledged property, and to perform all such other acts as reasonable may be required in connection with the credit to be provided.

66.     Debtors do not have sufficient capital to meet the expenses of operation and it is essential to the Debtors' efforts to maintain the value of their businesses while preparing for the sale of substantially all of their assets that they obtain the authority to make borrow the funds from Dougherty Funding, LLC.

67.     The Lender asserts that all of the Debtors' cash constitutes Cash Collateral (as defined below). The Debtors' use of the Cash Collateral is necessary to allow the Debtors to wind-down their affairs, liquidate their remaining assets, and manage these cases. Absent the use of Cash Collateral, the Debtors will be unable to perform these tasks, and the value of the Lender's Collateral will be seriously diminished.

68.     By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 361, 362, 363, 364 and 552 of the Bankruptcy Code and Bankruptcy Rule 4001(b), (a) authorizing the Debtors to obtain post-petition use of the cash claimed as collateral by the Lender, including, but not limited to, cash constituting the proceeds, product or profits of any pre-petition collateral (the "Prepetition Collateral") whether received prior to or after the Petition Date (collectively, "Cash Collateral"), on an interim basis for a period through and including the date of the Final Hearing; (b) granting and providing adequate protection to the Lender in the form of replacement liens; and (c) scheduling the Final Hearing.

69.     It is essential to the Debtors' efforts to maintain the value of their businesses while preparing for the sale of substantially all of their assets that they obtain the authority to make use of the Cash Collateral. The Debtors have supplied the Lender with a

budget for the Water Park expenditures through March 31, 2010 (the "Budget"), and the Cash Collateral will only be used to pay for expenses that are set forth in the Budget. Such expenses include, but are not limited to, professional fees, corporate overhead, and management fees, and costs related to the operation of the businesses.

70.     The reasons supporting the Debtors' need to use Cash Collateral during the course of these cases is compelling. As the Debtors have no unencumbered funds, use of the Cash Collateral is required to fund the day-to-day expenses of the Debtors' operations. Unless this Court authorizes use of the Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of their remaining assets. Therefore, authorization to use the Cash Collateral, pending the Final Hearing, is in the best interests of the Debtors' estates and creditors.

*The remainder of this page is intentionally left blank*

DB02:9032807.2                                                                068913.1001

## CONCLUSION

In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of the Chapter 11 Cases, I respectfully request that each of the First Day Motions be granted in their entirety, together with such other relief as this Court deems just and proper. I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: _12 -16 2009_

Steven A. Nerger
Proposed Chief Restructuring Officer