## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KLCG PROPERTY, LLC, and<br>GURNEE PROPERTY, LLC,<br><br><br>Debtors. [1] | Chapter 11<br><br>Case No. 09-14418 (KJC)<br><br>(Jointly Administered)<br><br>**Bid Procedures Hearing Date: February 9, 2010 at 10:30 am ET**<br>**Bid Procedures Objections Due: February 2, 2010 at 4:00 pm ET**<br><br>**Sale Hearing Date: March 18, 2010 at 2:00 p.m. (ET) (proposed)**<br>**Sale Objections Due: March 11, 2010 at 4:00 p.m. (ET) (proposed)** |

**DEBTORS' MOTION FOR ENTRY OF ORDERS, PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365, 503, AND 507 AND FEDERAL BANKRUPTCY RULES 2002, 6004, 6006, AND 9014: A)(I) ESTABLISHING BIDDING AND AUCTION PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) APPROVING BID PROTECTIONS FOR THE STALKING HORSE BIDDER; (III) PERMITTING CREDIT BIDDING PURSUANT TO BANKRUPTCY CODE SECTION 363(k); (IV) SCHEDULING AN AUCTION AND SALE HEARING FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (V) APPROVING NOTICE OF PROCEDURES FOR THE SOLICITATION OF BIDS, AN AUCTION AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; AND (VI) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING ASSET PURCHASE AGREEMENT; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (IV) GRANTING RELATED RELIEF**

KLCG Property, LLC ("KLCG") and Gurnee Property LLC, ("Gurnee Property")

(collectively, the "Debtors") hereby move this Court (the "Motion"), pursuant to §§ 105(a), 363,

365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for entry of: (A) an order attached hereto as Exhibit A (the

"Bidding Procedures Order"): (I) establishing bidding and auction procedures for the sale of all

---

[1] The last four digits of Debtors' federal tax identification numbers are: KLCG Property LLC (0521) and Gurnee Property, LLC (1995). The Debtors' address is 1700 Nations Drive, Gurnee, Illinois 60031.

or substantially all of the Debtors' assets; (II) approving bid protections for Dougherty Funding LLC or its assignee(s) or designee(s) (the "Stalking Horse Bidder") in accordance with the asset purchase agreement (as such may be amended, modified, supplemented or restated from time to time, and including all schedules and exhibits thereto, the "Purchase Agreement") by and between the Debtors and the Stalking Horse Bidder, a copy of which is attached hereto as Exhibit B; (III) establishing procedures for debtors to enter into substitute stalking horse purchase agreements with bid protections; (IV) permitting credit bidding pursuant to Bankruptcy Code section 363(k); (V) scheduling an auction (the "Auction") and sale hearing (the "Sale Hearing") for the sale of all or substantially all of the Debtors' assets and approving the form and manner of notice of the auction and sale, attached hereto as Exhibit C, (the "Auction and Sale Notice"); (VI) establishing procedures for assumption and assignment of certain Assigned Contracts[2], including notice of proposed cure amounts and approving the form and manner of notice with respect thereto as attached hereto as Exhibit D (the "Cure Amount Notice"); and (VII) granting related relief; and entry of an order attached hereto as Exhibit E (the "Sale Order")[3] (B)(I) authorizing the sale of such assets free and clear of liens, claims and encumbrances and other interests pursuant to the Purchase Agreement, substantially in the form of the Sale Order attached hereto as Exhibit E; (II) authorizing and approving the Purchase Agreement; (III) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; and (IV) granting related relief. In support of this Motion, the Debtors respectfully state as follows:

---

[2] All capitalized terms shall have the meaning ascribed to them in the Purchase Agreement unless otherwise defined herein.

[3] If the terms of any agreement respecting the Sale require modification of the proposed Sale Order, the Debtors will provide notice of the modified proposed Sale Order to the Court and interested parties in advance of the Sale Hearing.

# PRELIMINARY STATEMENT

1.     The Debtors commenced these chapter 11 cases on December 16, 2009.  Debtors own and operate a 414-room destination resort hotel, indoor water park and conference center located north of Chicago in Gurnee, Illinois.   The resort hotel and indoor water park are hereinafter referred to as the "Water Park."

2.     The recent economic downturn has decreased consumer demand for destination resorts and water parks.  The nation as a whole is experiencing a downturn in the entertainment, travel and vacation industries, and the Water Park, as a family entertainment resort, has also experienced this downturn.   Furthermore, regional economic difficulties in southern Michigan, northern Indiana and the surrounding areas may have had a disproportionately negative impact on the occupancy rate at the Water Park.

3.     Due to (a) Debtors' inability to pay its obligations as they become due as well as their financially burdensome capital structure (including debt and subordinated debt), (b) the Debtors' need to reduce debt load and interest expenses, and (c) the Debtors' mounting concerns regarding the potential deterioration of their businesses—and accompanying degradation in value—stemming from rumors in the marketplace about the Debtors' liquidity and viability, the Debtors have determined that the value of their estates would be best maximized and preserved through a sale process (the "Sale").

4.     Therefore, the Debtors intend to complete by March 18, 2010 a going-concern Sale of their businesses and assets (the "Assets") to the Debtors' first secured lender, Dougherty Funding, LLC as the stalking horse bidder (the ''Stalking Horse Bidder'') through a credit bid pursuant to section 363(k) of the Bankruptcy Code in accordance with the Purchase Agreement. The Debtors commenced these Chapter 11 Cases to implement the Sale pursuant to section 363 of

DB02:9156875.2                                                                                                                    068913.1001

the Bankruptcy Code, subject to a competitive Sale process and the solicitation of higher and/or otherwise better offers.

5.      The Debtors believe that unless the Sale is expeditiously consummated, whether to the proposed Stalking Horse Bidder or to a purchaser submitting a higher or otherwise better offer, there will be significant value deterioration and that the Debtors will have insufficient capital or assets to fund their post-petition administrative expenses. Consequently, the Debtors have determined that their only option at this time is to move forward with a Bankruptcy Court sanctioned sale process, and the Debtors submit that such course of action is in the best interest of their estates, creditors and other parties-in- interest.

## JURISDICTION

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9019 and Local Rule 6004-1.

## GENERAL BACKGROUND

7.      On December 16, 2009 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

8.      Each Debtor is continuing to operate its businesses and manage its property as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      An official committee of unsecured creditors (the "Committee") was appointed by the Office of the United States Trustee on or about January 7, 2010. No trustee or examiner has been requested or appointed.

DB02:9156875.2                    068913.1001

10.   A detailed description of the events leading up to this chapter 11 filing is set forth more fully in the Declaration of Steven A Nerger in Support of Chapter 11 Petitions and First Day Motions [Docket No. 2] (the "Declaration"), filed in these cases on December 16, 2009 and incorporated herein by reference.

## RELEVANT BACKGROUND

11.   On December 16, 2009, the Debtors filed a Motion with this Court to authorize their entry into and borrow under the DIP Facility [Docket No.10] (the "DIP Motion"). The Court approved the DIP Motion and the Debtors' borrowing under the DIP Facility on an interim basis by order entered on December 17, 2009 [Docket No. 23] (the "Interim DIP Order"), and a final hearing is scheduled for January 28, 2010. The DIP Loan Agreement provides for a secured, super-priority credit facility of up to $743,833 on an interim basis and up to $2,800,000 upon entry of the "Final Order" (as defined n the Interim DIP Order) (the "Final DIP Order").

12.   The Debtors, in consultation with their investment bankers, William Blair & Company, L.L.C. ("William Blair"), their other professionals, and other interested parties, have considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for their creditors and to ensure the long-term survival of their business. After considering their options and the economic realities of their businesses and these cases, the Debtors have determined that the floor established by a purchase of all or substantially all of their assets by the Stalking Horse Bidder pursuant to the terms set forth in an Purchase Agreement to be approved by the Bankruptcy Court in accordance with Bidding Procedures (the "Proposed Sale"), subject to higher and better bids pursuant to a Bankruptcy Court approved open auction process pursuant to section 363 of the Bankruptcy Code, affords them the best opportunity to maximize value for their assets and their estates.

DB02:9156875.2                                                                          068913.1001

13.     The implementation of an orderly sale process under the supervision of this Court, with the Stalking Horse Bidder providing a floor against which interested parties may bid, will permit the Debtors to consummate a going-concern sale of all or substantially all of their assets and maximize value of their estates for all interested parties.

## RELIEF REQUESTED

14.     By this Motion, the Debtors respectfully request first, (A) the entry of the Sales Procedures Order, (I) approving certain bidding procedures, for the proposed sale of substantially all of the Debtors' Assets; (II) permitting credit bidding pursuant to Bankruptcy Code section 363(k); (III) scheduling the Sale Hearing and approving the Auction and Sale Notice; (IV) establishing procedures for assumption and assignment of certain executory contracts and unexpired leases, including the Cure Amount Notice; and (V) granting related relief; and second, (B) the entry of one or more Sale Orders, (I) authorizing the sale of such assets free and clear of liens, claims and encumbrances and other interests; (II) authorizing and approving an Purchase Agreement; (III) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto; (IV) providing for payment of sale proceeds to secured lender; and (V) granting related relief.

15.     The Stalking Horse Bidder and certain "Potential Bidders" (as defined below) may request information with respect to certain Assigned Contracts as defined in the Purchase Agreement some of which may contain confidentiality provisions[4]. Accordingly, by this Motion, notwithstanding the existence of such a confidentiality provision, the Debtors also seek authority to provide the Stalking Horse Bidder and Potential Bidders a copy of any Assigned Contract to those who have executed a confidentiality agreement.

---

[4] While the Debtors sell directly to consumers, the Debtors have not disclosed to any individual any policy prohibiting the transfer of personally identifiable information and therefor the requirements of section 332(b)(1) of the Bankruptcy Code are inapplicable. *See* 11 U.S.C. §363(b)(1).

*A.*    ***The Proposed Sale***

16.    Debtors propose to retain William Blair as their investment bankers, and continue a process of exploring strategic alternatives, including a potential sale or restructuring of the Debtors' businesses.  The Debtors, in consultation with William Blair and other professionals considered a number of potential sales and restructuring alternatives in order to develop a plan that would maximize value for their creditors and to ensure the long-term survival of their businesses.  After considering their options, the Debtors, in consultation with their professionals, believe that a Proposed Sale affords them the best opportunity to maximize value for their assets and estates.   The Debtors intend to continue to aggressively solicit potential purchasers in accordance with the Bidding Procedures set forth herein in order to maximize the value of their assets and estates.

17.    Accordingly, the Debtors have proposed the following timeline for the Sale of the Assets:[5]

| | |
|---|---|
| February 9, 2010 at 10:30 a.m. | Bid Procedures Hearing |
| March 12, 2010 at 4:00 p.m. | Submission Deadline for Qualified Bids |
| March 16, 2010 at 10:00 a.m. | Auction |
| March 18, 2010 at 2:00 p.m. | Proposed Sale Hearing |

*B.*    ***The Asset Purchase Agreement***

18.    The Debtors, as "Sellers" (in such capacity being sometimes referred to herein as the "Sellers") have agreed upon the terms as set forth in the Purchase Agreement with the Stalking Horse Bidder, pursuant to which the Stalking Horse Bidder will acquire, subject to the

---

[5] The Debtors, in the exercise of their business judgment, reserve their right to change these Sale-related dates in order to return the maximum value of the Assets.

auction process set forth in the Bidding Procedures and the Bidding Procedures Order, substantially all of the Debtors' Assets.

19.     The material terms of the Purchase Agreement are as follows:[6]

**Purchase Price**:  The initial purchase price of the Purchased Assets is estimated to be $65,000,000 in addition to the Cure Amounts paid by the Purchaser and shall be equal to the sum of: (a) a portion of the Prepetition Senior Obligations owing to Prepetition Senior Lender pursuant to the Prepetition Senior Loan documents as of the Closing Date (including all outstanding principal, accrued but unpaid interest at the applicable rate set forth in the Prepetition Senior Loan Documents, and all fees, costs and charges properly chargeable under the Prepetition Senior Loan Documents, including all attorneys' fees and legal expenses through (and including) the Closing Date), plus (b) all DIP Indebtedness owing to DIP Lender pursuant to the DIP Loan Documents (including all outstanding principal, accrued but unpaid interest at the applicable rate set forth in the DIP Loan Documents, and all fees, costs and charges properly chargeable under the DIP Loan Documents, including all attorneys' fees and legal expenses through (and including) the Closing Date). As additional consideration for the Purchased Assets, Purchaser shall also pay the balance of the fee due William Blair & Company in connection with the sale of the Purchased Assets to Purchaser.

**Purchased Assets**:  The Debtors are proposing a sale of substantially all of their assets, as set forth more fully in Section 2.1 of the Purchase Agreement.

**Assumed Liabilities and Cure Amount**:  In addition to the credit bid, the Stalking Horse Bidder has agreed to assume, effective as of the Closing, and to timely perform and discharge in accordance with their respective terms, (a) all of Sellers' liabilities and obligations arising from and after the Closing Date under the Assigned Contracts; and (b) the Cure Amounts. (Purchase Agreement, **Section 2.3**).

**Excluded Assets**:  The Stalking Horse Bidder has not agreed to purchase, and Sellers have not agreed to sell, the Excluded Assets, to be set forth on **Exhibit D** to the Purchase Agreement including, without limitation: (a) any Contract that is not an Assigned Contract; (b) Sellers' rights under the Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof; and (c) cash and cash equivalents, including cash on hand or in the Deposit Accounts, certificates of deposit, commercial paper and securities owned by Sellers, necessary to pay: (i) Approved Budget Expenses (other than the

---

[6]  The summary of the Purchase Agreement is provided for the Court's convenience only.  To the extent that the summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.  Capitalized terms used but not defined in this summary shall have the meanings given in the Purchase Agreement.

Carve-Out) that remain to be paid on or after the Closing Date; (ii) the Carve-Out but only to the extent not previously paid from an advance on the DIP Loan Agreement; (iii) any Retainer described in the Final Order; and (d) any S&L Assets (as defined in the Purchase Agreement) on site. (Purchase Agreement, **Section 2.2** and **Exhibit D**).

**Release of Claims**: **Section 2.6** of the Purchase Agreement provides for a release of the Sellers' claims against the Stalking Horse Bidder and a covenant not to sue the Stalking Horse Bidder. This release and covenant not to sue would release the Stalking Horse Bidder from, any and all rights, claims or causes of action of Sellers against the Stalking Horse Bidder relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, including, but not limited to, any Commercial Tort Claims and Avoidance Claims, but specifically excluding Sellers' rights, claims or causes of action in connection with the Agreement and related documents. To effect the foregoing, at the Closing, Sellers shall execute and deliver to the Stalking Horse Bidder the Release. (Purchase Agreement, **Section 2.6**).

**Closing**: A Closing shall take place on the date that is not more than two (2) Business Days following the satisfaction or waiver of the conditions set forth in **Sections 9.1**, **9.2** and **9.3** of the Purchase Agreement (other than conditions that by their nature are to be satisfied at the Closing), unless another time or date, or both, are agreed to in writing by the parties hereto. (Purchase Agreement, **Section 4.1**). The Purchase Agreement may be terminated prior to closing by the parties as set forth more fully in **Section 4.4** of the Purchase Agreement.

**Preservation of Records**: Each of the parties to the Purchase Agreement agrees to preserve, segregate and keep the records held by it or its Affiliates relating to the Purchased Assets, Assumed Liabilities and employees of the Sellers hired by the Stalking Horse Bidder for a period of one (1) year from the Closing Date and shall make such records and personnel available to the other, subject to compliance with applicable Law, as may be reasonably required by such party in connection with, among other things, the Bankruptcy Case or any matters or proceedings in connection therewith, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or the Stalking Horse Bidder or any of their Affiliates or in order to enable Sellers or the Stalking Horse Bidder to comply with their respective obligations under the Purchase Agreement and each other agreement, document or instrument contemplated thereby. (Purchase Agreement, **Section 8.8**).

**Alternative Stalking Horse Bidder**: By no later than fifteen (15) Business Days prior to the Bid Deadline, the Debtors are able to secure an alternative stalking horse bidder that is acceptable to both the Debtors, DIP Lender and the Prepetition Senior Lender.

**Assignment**: The Stalking Horse Bidder has the right to assign, in its sole discretion and without any approval from Sellers, to assign any or all of its rights,

DB02:9156875.2 068913.1001

interests and obligations hereunder to: (a) any Affiliate, (b) any Person whose equity holders are some or all of the participants in the DIP Facility and/or the Prepetition Senior Obligations, (c) any direct or indirect wholly owned subsidiary of Purchaser, and/or (c) any purchaser of the Prepetition Senior Obligations and/or the DIP Indebtedness *provided,* that any assignment to an "Insider" (as defined in section 101(31) of the Bankruptcy Code) shall require the prior approval of the Bankruptcy Court. Upon such assignment, Purchaser shall be released and discharged from any liability under the Purchase Agreement.

20.     In order to maximize the Debtors' assets for the benefit of their estates and creditors, the Debtors, in consultation with their professionals, have determined that it was in the best interests of the estates to commence the formal solicitation of bids for the sale of the Assets as a going concern.   As a result, in contemplation of Court approval of the proposed Bidding Procedures, the Debtors (through William Blair) have begun to actively market their Assets.   The Debtors intend to continue to aggressively solicit potential purchasers in accordance with the Bidding Procedures set forth herein.

## C.     *Proposed Bidding Procedures*

21.     The Debtors desire to receive the greatest value for the Assets.   Accordingly, the Bidding Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the Sale process, but with the goal of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Assets.   Moreover, the Bidding Procedures reflect the Debtors' objective of conducting an auction in a controlled, but fair and open, fashion that maximizes interest in the Assets by financially-capable, motivated bidders who are likely to close a transaction.

DB02:9156875.2                                                                                              068913.1001

22.    The following paragraphs in this Section summarize only the key provisions of the Bidding Procedures, but are qualified in their entirety by reference to the actual Bidding Procedures attached hereto.[7]

> **Participation Requirements**:   To participate in the process detailed by the Bidding Procedures and to otherwise be considered for any purpose hereunder, each bidder ("Potential Bidder") must become a Qualified Bidder.   As a prerequisite to becoming a Qualified Bidder, a Potential Bidder must deliver to the Debtors, by no later than **February 25, 2010 at 4:00 p.m. (Eastern Time)** (the "Participant Requirements"):
>
> > (a)    Identification of Potential Bidder.    Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;
> >
> > (b)    Non-Binding Expression of Interest.    An executed non-binding indication of interest satisfactory to the Debtors that must reasonably identify the contemplated transaction, including the assets proposed to be acquired, the proposed purchase price, contingencies, and conditions precedent to closing;
> >
> > (c)    Corporate Authority.    Written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; *provided, however*, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction (and "Acquisition Entity"), then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals");
> >
> > (d)    Confidentiality Agreement.    An executed confidentiality agreement in form and substance acceptable to the Debtors and their respective counsel and substantially on the same terms as the confidentiality agreement approved by the Stalking Horse Bidder; and
> >
> > (e)    Proof of Financial Ability to Perform.    Written evidence upon which the Debtors may reasonably conclude that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction.   Such information should include, among other things, the following:

---

[7]  Capitalized terms used and not defined in this paragraph shall have the meanings ascribed to them in the Bidding Procedures.

068913.1001

(i) the Potential Bidder's or, in the case of an Acquisition Entity, the Principals', current financial statements (audited if they exist);

(ii) contact names and numbers for verification of financing sources;

(iii) evidence of the Potential Bidder's or Principals' internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(iv) any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated transaction; *provided, however*, that the Debtors shall determine, in their reasonable discretion, in consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications.

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose Bids for the assets of the Debtors do not overlap and who agree to have their Bids combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder, and who shall also be referred to herein as a single Qualified Bidder) that delivers the documents described in paragraphs (a) through (e) above, and that the Debtors, in their discretion and after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, determines is reasonably likely to submit a bona fide offer that will result in greater cash value being received for the benefit of the Debtors' creditors than under the Purchase Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below). No later than three (3) business days after the Potential Bidder delivers all of the documents described in paragraphs (a) through (e) above, the Debtors will notify a Potential Bidder whether it is a Qualified Bidder. The Stalking Horse Bidder is a Qualified Bidder.

**Reservation of Right to Seek Approval of Alternative Stalking Horse Bidder**: The Debtors are not seeking, through this Motion, approval of a stalking horse bid that contemplates the payment of a break-up fee or expense reimbursement. However, in the event that the Debtors are able to secure an alternative stalking horse bidder that is acceptable to both the Debtors, DIP Lender and the Prepetition Senior Lender, the Debtors expressly reserve the right to seek approval of bidding protections in favor of such bidder if the Debtors believe that

DB02:9156875.2 068913.1001

such relief is necessary to maximize the value of their assets for the benefit of the stakeholders of their estates.

**Bid Deadline**: A Potential Bidder must deliver its initial bid (an "Initial Bid") by **March 12, 2010 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") to: (a) the Debtors, 1700 Nations Drive, Gurnee, Illinois 60031, Attn: Steve A. Nerger, CRO; (b) counsel to the Debtors, von Briesen and Roper, S.C., 3 South Pinckney Street, Suite 1000, Madison, Wisconsin 53703-4200, Attn: Randall D. Crocker (rcrocker@vonbriesen.com) and Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Fl., Wilmington, Delaware 19801, Attn: Michael R. Nestor (mnestor@ycst.com) (c) investment bankers for the Debtors, William Blair & Company L.L.C., 222 West Adams Street, Chicago, Illinois 60606, Attn: Geoffrey Richards (grichards@williamblair.com); (d) counsel to the Stalking Horse Bidder, Fabyanske, Westra, Hart & Thomson, P.A., 800 LaSalle Avenue Suite 1900, Minneapolis, Minnesota, 55402 Attn: Mark W. Westra (mwestra@fwhtlaw.com) and Paul Ratelle (pratelle @fwhtlaw.com) and (e) the Office of the United States Trustee, 844 North King Street, Suite 2207, Wilmington, DE 19801, Attn: Patrick Tinker (fax (302) 573-6497) (collectively, the "Notice Parties"). The Debtors may, in their sole discretion, exercised after consultation with the Stalking Horse Bidder and the Committee, extend the Bid Deadline without further notice and for one or more bidders, but shall not be obligated to do so.

**Initial Bid Requirements**. For any Initial Bid to constitute a Qualified Bid, such Initial Bid must, at a minimum, comply with the following requirements:

(a)    The Initial Bid must be received by the Bid Deadline;

(b)    The Initial Bid must contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Purchase Agreement (a "Qualified Purchase Agreement") and identifying the Assets the party seeks to purchase with, at a minimum, the following requirements: (i) having terms and conditions no less favorable to the Debtors than those of the Purchase Agreement, except with higher or better consideration, which can be determined by aggregating bids made on different portions of the Debtors' Assets ("Aggregate Bids") (provided that no Initial Bid shall provide for the payment to such bidder of any break-up fee, topping fee, expense reimbursement, or other similar arrangement); (ii) providing for consideration that is, alone or in conjunction with other Competing Bids when weighed against the transaction contemplated by the Purchase Agreement in Sellers' reasonable business judgment, as determined after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, likely to result in value to Sellers (taking into account the impact of any delay in closing the transaction contemplated by such Competing Bid(s), purchase price adjustments, arrangements regarding

DB02:9156875.2

068913.1001

Sellers' Inventory and Accounts Receivable, cure amounts, contracts to be assumed and assigned, closing conditions, certainty of completion and any other relevant factors) greater than the sum of (A) cash consideration greater than the amount of the credit bid set forth in the Purchase Agreement, plus (B) the Cure Amounts to be paid by the purchaser, plus (C) the balance of the fee due William Blair & Company in connection with the sale of the Purchased Assets to the purchaser, plus (D) $150,000 (the "Minimum Overbid Amount"); (iii) providing for a deposit (the "Deposit")in the aggregate amount of at least equal to $150,000 and (iv) not being subject to any (w) financing contingency, (y) contingency relating to the approval of the bidder's board of directors or other internal approvals or consents, or (z) any conditions precedent to the bidder's obligation to purchase the Assets other than those included in the Purchase Agreement (See Purchase Agreement, **Section 7.2(b)** and **Schedule 7.2(b)**;

(c)     The Initial Bid(s) must be accompanied by the provision of a certified or bank check, wire transfer, or letter of credit reasonably acceptable to the Debtors, in consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, in the aggregate amount of the Deposit, to be held in escrow and credited to the closing payment if the bidder(s) are ultimately determined to be the Successful Bidder(s) (as defined below) or to be returned to the bidder(s) otherwise and a written statement that the bidder(s) agree to be bound by the terms of these Bidding Procedures and the Bidding Procedures Order;

(d)     To the extent not previously provided to Debtors, the Initial Bid must be accompanied by evidence satisfactory to Debtors in their commercially reasonable discretion, as exercised after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, that the bidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under its Qualified Purchase Agreement (or its equivalent) in the event that it submits a "Successful Bid" (as defined below) at the Auction;

(e)     The Initial Bid(s) must remain open and irrevocable through and including the second Business Day after the Assets on which a Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale approved by the Bankruptcy Court;

(f)     The Initial Bid must clearly state the range of cash consideration, in U.S. dollars, that the bidder(s) are prepared to pay for any or all of Debtors' assets. Only cash consideration will be evaluated for this purpose; the utilization of notes or other instruments to make up a portion of the cash consideration will not be evaluated as cash; and

DB02:9156875.2

068913.1001

(g)     The Initial Bid must be accompanied by information and assurances satisfactory to the Debtors that the bidder(s) can obtain all required consents, approvals and licenses to fulfill the terms, conditions and obligations under any and all related agreements, including but not limited to, sufficient information to permit the Court, the Debtors and any applicable lessors or counterparties to determine the proposed assignee's ability to comply with the requirements of section 365 of the Bankruptcy Code (to the extent applicable).

The Sellers, after consultation with the DIP Lender, the Prepetition Senior Lender, and the Committee, will evaluate any Initial Bids submitted by a Qualified Bidder and determine whether to deem any such bid(s) as a "Qualified Bid". Initial Bids will be evaluated on the basis of factors such as but not limited to: (m) the indicated purchase price, (n) the Qualified Bidder's financial capacity to consummate a transaction if selected as the Successful Bidder, (o) the extent and type of requested changes to the Purchase Agreement, (p) any required government approvals and the perceived timing and difficulty in connection therewith; (q) the Qualified Bidder's ability to expeditiously consummate the transaction if selected as a Successful Bid, and (r) other factors deemed appropriate in the Sellers' discretion, after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee. The Sellers, after consultation with the DIP Lender, Prepetition Senior Lender and the Committee, will select those Initial Bids that they consider to be Qualified Bids as soon as practicable after the submission of the Initial Bid and will notify the Potential Bidder whether its Initial Bid is a Qualified Bid, but in event prior to the Auction, *provided, however,* that the Sellers, after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, reserve the right to : (y) determine the value of any Qualified Bid and which Qualified Bid constitutes the highest or best offer; and/or (z) reject any Initial Bid as insufficient. The Stalking Horse Bid is a Qualified Bid. If no other Qualified Bid is received, the Sellers shall have no obligation to conduct an Auction.

**The Auction**: If a Qualified Bid, other than that submitted by the Stalking Horse Bidder is received, then the Sellers will conduct an auction (the "Auction"), "), currently proposed to be held on March 16, 2010 at 10:00 a.m. (Eastern Time) at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Fl., Wilmington, Delaware 19801 or such other place and time as the Debtors shall notify all Qualified Bidders and expressed their intent to participate in the Auction, subject to change. In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder and shall be required to comply with the requirements of the Bidding Procedures. The Stalking Horse Bidder, parties who submit Qualified Bids prior to the Bid Deadline, the DIP Lender, the Prepetition Senior Lender, counsel to the Committee, the United States Trustee, the Debtors, and the professionals of the foregoing shall be entitled to attend and be heard at the Auction. Any creditor of the Debtors who wishes to attend the Auction may do so as long as it gives written notice of its planned attendance to

DB02:9156875.2

068913.1001

Debtors' counsel at least two (2) business days prior to the Auction. Each bidder participating at the Auction must confirm on the record that it has not and will not engage in any collusion with respect to the bids submitted at the Auction. The bidding at any Auction will be transcribed by a court reporter.

Except as otherwise provided in the Bidding Procedures Order, based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtors determine is relevant, the Debtors, after consultation with the DIP Lender, Prepetition Senior Lender and the Committee, may conduct the Auction in any manner that they determine will achieve the maximum value for the Assets.

Prior to concluding the Auction, the Debtors, after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, (a) review each Qualified Bid on the basis of the financial and contractual terms and factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (b) identify the highest or otherwise best offer for the Assets (to the extent any such bid is acceptable to Debtors, after consultation with the DIP Lender, Prepetition Senior Lender and the Committee, and subject to Bankruptcy Court approval, the "Successful Bid(s)" and each bidder making such bid, a "Successful Bidder") and the next highest or otherwise best offer, if any, after the Successful Bid (the "Back-Up Bid" and the bidder making such bid, the "Back-Up Bidder").

If no Qualified Bid from a Qualified Bidder shall have been received by the Bid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Purchase Agreement.

Subject to the terms and provisions of the Purchase Agreement, the Debtors, after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, reserve the right to reject at any time prior to the entry of an order of the Bankruptcy Court approving a sale of any of the Debtors' Assets, any offer which the Debtors deem to be (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Procedure of the United States Bankruptcy Court for the District of Delaware, or the terms and conditions of the Sale set forth herein, or (iii) contrary to the best interests of the Debtors, their estates, and their creditors.

**The Sale Hearing**: The Debtors intend to present the Successful Bid for approval by the Court at a final hearing to approve the Sale Motion (the "Sale Hearing") to be scheduled by the Court and currently proposed as **March 18, 2010 at 2:00 p.m. (Eastern Time)**. The Stalking Horse Bid is a qualified and acceptable bid. The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Subject to Bankruptcy Court approval following the Auction, the Successful Bidder(s) shall purchase the Assets, free and clear of all liens, claims, interests and encumbrances, pursuant to the

DB02:9156875.2

068913.1001

Successful Bid and the corresponding order(s) of the Court approving the Sale. Upon the failure to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bid, as disclosed and approved at the Sale Hearing, shall be deemed to be the Successful Bid(s) without further order of the Court and the Debtors will be authorized, but not required, to consummate the Sale(s) with the Back-Up Bidder. The Sale Hearing may be adjourned or rescheduled without notice other than by announcement of the adjourned date at the Sale Hearing. Any sale of the Assets shall be without representation or warranties of any kind, nature or description by the Debtors, their agents or their estate, except as provided in the purchase agreement between the Debtors and the subject purchaser. All of the Assets shall be transferred "as is," "where is" and "with all faults." **THE DEBTORS EXPRESSLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSET.**

**Reservation of Rights**: Subject to the terms and provisions of the Purchase Agreement, the Debtors, after consultation with the DIP Lender, the Prepetition Senior Lender and the Committee, reserve their rights to: (a) impose at or before the Auction such other and additional terms and conditions as may be in the interest of the Debtors, their estates and creditors (so long as such terms are not materially inconsistent with the terms of the Bidding Procedures Order or these Bidding Procedures); (b) extend the deadlines set forth in the Bidding Procedures Order and/or these Bidding Procedures; (c) adjourn the Auction at or before the Auction; (d) adjourn the Sale Hearing without further notice by making an announcement in open Court or by the filing of a hearing agenda pursuant to Bankr. D. Del. L.R. 9029-3; (e) waive the terms and conditions set forth herein; (f) withdraw from the Auction some or all of the Assets at any time prior to or during the Auction; and (g) cancel the Auction.

23.     The Debtors submit that implementation of the Bidding Procedures will not chill bidding for the Assets. To the contrary, approval of the Bidding Procedures will invigorate bidding. As set forth above, since the Petition Date, the Debtors, through their management and William Blair, have employed substantial marketing efforts aimed toward garnering interest in the Assets. Contemporaneously with these marketing efforts, the Debtors have decided in the interest of time to proceed with their sale to the Stalking Horse Bidder, subject to continued marketing to potential bidders with the goal of maximizing value for creditors. The Debtors submit that the Bidding Procedures provide a structure and format that encourages all bidders to submit the

highest and best offers for all of the Debtors' Assets. Accordingly, the Debtors submit that the Bidding Procedures are in the best interests of the Debtors, their estates and their creditors.

**D.    *Notice of Sale Hearing, Auction, Bidding Procedures, and Objection Dates***

24.    The Debtors propose to have the Sale Hearing on **March 18, 2010 at 2:00 p.m. (Eastern Time)**, with an objection deadline for such Sale Hearing set for **March 11, 2010 at 4:00 p.m. (Eastern Time)**.

25.    Not later than three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause the Auction and Sale Notice, substantially in the form attached hereto as Exhibit C, to be sent by first-class mail, postage-prepaid, to (a) all entities that are know to have asserted any claim, interest, lien or encumbrance on the Assets; (b) non-Debtor parties to executory contracts and unexpired leases subject to the proposed Sale; (c) all governmental taxing authorities that have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against the Debtors; (d) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (e) all known creditors (whether liquidated, contingent or unmatured) of the Debtors; (f) all interested governmental, pension, and environmental entities; (g) the Office of the United States Trustee; (h) counsel to the DIP Lender and the Prepetition Senior Lender, (i) all entities that have, within the past 6 months, expressed to the Debtors an interest in purchasing the Assets or to have executed confidentiality agreements in connection therewith; and (j) parties who have requested service pursuant to Bankruptcy Rule 2002.

26.    Not later than ten (10) days after entry of the Bidding Procedures Order, the Debtors will cause the Auction and Sale Notice, substantially in the form attached hereto as Exhibit C, to be published in a regional newspaper in proximity to the Assets including one of the following: the Chicago Tribune, the Chicago Sun-Times or the Chicago Daily Law Bulletin, as to

18

be determined by Debtors, pursuant to Bankruptcy Rule 2002(l). Such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to Debtors.

27.     The Debtors request that all objections to the relief requested in the Motion in connection with the Sale of the Debtors' Assets (other than any objection to the assumption or assignment of any executory contract or unexpired lease or the proposed Cure Amount with respect thereto that is subject to the "Assigned Contract Objection Procedures" (as defined below)) be: (a) in writing; (b) comply with the Federal Rules of Bankruptcy Procedures and the Local Bankruptcy Rules (c) signed by counsel or attested to by the objecting party; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, DE 19801 on or before **March 11, 2010 at 4:00 p.m, (Eastern Time)** (the "Sale Objection Deadline"); and (e) served so as to be received on or before the Sale Objection Deadline by the Notice Parties. The foregoing requirements are collectively referred to herein as the "General Objection Procedures." Only those objections made in compliance with the General Objection Procedures will be considered by the Court at the hearing on this Motion. The failure of any objecting person or entity to file its objections by the Sale Objection Deadline and in accordance with the General Objection Procedures will be a bar to the assertion, at hearing on this Motion, the Sale Hearing or thereafter, of any objection to the proposed sale of Assets, including any objection to the sale of any of the Assets free and clear of Liens, with any Liens to attach to any sale proceeds that exceed the Purchase Price in the same order of priority, and to the same extent as such Liens were valid, perfected and enforceable prior to such sale.

DB02:9156875.2                                                                                    068913.1001

29. As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve, with the Bankruptcy Court a notice (the "Post Auction Notice") identifying any Successful Bidder (and Back-Up Bidder) in substantially the form of Exhibit F attached hereto.

E. **Assignment and Assumption Procedures.**

28. Further, to facilitate the sale, assumption, and assignment of any Assigned Contracts, the Debtors propose to serve the Cure Amount Notice (the "Cure Amount Notice"), substantially in the form attached hereto as Exhibit D, upon the non-debtor parties to the Contracts as soon as practicable after entry of the Bidding Procedures Order and request that the Court approve the procedure set forth below for fixing any cure amount owed on the Contracts.

29. The Debtors will attach to the Cure Amount Notice their calculation of the cure amounts (the "Cure Amount") that they believe must be paid by the Purchaser at Closing to cure all defaults under all Contracts subject to assumption and assignment. If the amount list is zero ($0), the Debtors believe that there is no Cure Amount to be paid in connection with such assumption and assignment.

30. The Debtors propose that any non-debtor party to a Contact objecting to the potential assumption and assignment of its Contract on any grounds (other than the provision of adequate assurance of future performance in connection therewith pursuant to section 365 of the Bankruptcy Code ("Adequate Assurance")) must timely file an objection (the "Cure Amount/Assignment Objection") and serve a copy on the Notice Parties within twenty (20) days after the date of the Cure Amount Notice (the "Cure Amount/Assignment Objection Deadline"). A Cure Amount/ Assignment Objection must: (a) comply with the General Objection Procedures; (b) identify the Contract to which the objector is party; (c) describe with particularity any cure the claimant contends is required under section 365 of the Bankruptcy Code (the "Cure Claim") and

DB02:9156875.2 068913.1001

identify the basis(es) of the alleged Cure Claim; (d) attach all documents supporting or evidencing the Cure Claim or otherwise setting forth the grounds for objection to the proposed assumption and assignment (collectively with the General Objection Procedures, the "Assigned Contract Objection Procedures").

31.     If no Cure Amount/Assignment Objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, the Debtors request that the Cure Amount set forth in the Cure Amount Notice be controlling notwithstanding anything to the contrary in any Contract or other document and that the non-debtor party to the Contract be forever barred from asserting any other claim arising prior to the assignment against the Debtors or the Successful Bidder (or Back-Up Bidder) as to such Contract. To the extent the Debtors dispute any Cure Claim, the Debtors request that such dispute be presented to the Court at the Sale Hearing, or such later date and time as the Debtors, the objector, and (after the Auction) the Successful Bidder (or Back-Up Bidder), may agree or the Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of a Contract.

32.     As soon as possible after the conclusion of the Auction, the Debtors shall file, with the Bankruptcy Court, but not serve, a Post Auction Notice that identifies any Successful Bidder (and Back-Up Bidder) and provides notice that the Debtors will seek to assume and assign the Assigned Contracts at the Sale Hearing.

33.     At the Sale Hearing, the Debtors (a) shall present evidence necessary to demonstrate Adequate Assurance by any Successful Bidder (and Back-Up Bidder) and (b) request entry of an order approving the assumption and assignment of any Assigned Contracts to any Successful Bidder (or Back-Up Bidder).

DB02:9156875.2                                                                                         068913.1001

34.     In addition, in the event the Court approves the Stalking Horse Bidder as the purchaser of the Assets, the Stalking Horse Bidder may elect to take assignment of certain contracts and leases listed on **Exhibit C** to the Purchase Agreement for up to thirty (30) days after the closing of the Sale (the "Post-Closing Assumed Contracts"). Upon designation of such Post-Closing Assumed Contracts, the Debtors will file with the Bankruptcy Court and serve a notice (the "Post-Closing Assumption Notice"), substantially in the form of Exhibit G attached hereto, on the non-debtor counterparties to the Post-Closing Assumed Contracts that identifies the Stalking Horse Bidder as the purchaser of the Assets and provides notice that the Debtors are assuming and assigning the Post-Closing Assumed Contracts to the Stalking Horse Bidder.[8]

## BASIS FOR RELIEF

### A.     *The Proposed Bidding Procedures Are Appropriate*

35.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bidding Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

36.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Company*, 186 B.R. 98 (Bankr. N.D. Ill. 1995)

---

[8] The non-debtor counterparties would have previously received a Cure Amount Notice pursuant to the assignment and assumption procedures described above, and would have been provided with an opportunity to object to the proposed Cure Amount and the ability of the Stalking Horse Bidder to provide adequate assurance of future performance.

(internal quotation, citation omitted); *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

37.     Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefor. *See Schipper*, 933 F.2d at 515; *In re Lionel Com.*, 722 F.2d at 1071; *In re Delaware Hudson Ry. Co.*, 124 B.R. 169 at 179.

38.     The Bidding Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and employees. The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bidding Procedures represents a sound exercise of the Debtors' business judgment.

39.     The Debtors have sound business justifications for seeking approval of the Bidding Procedures at this juncture. The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence an auction process immediately. Accordingly, the Debtors and their advisors have been diligently working towards consummating a Sale that will maximize returns to stakeholders.

40.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, benefit may be found if the bidding procedures and protections "promote[] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a

bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.; See Also O'Brien at 536.*

41.     Whether evaluated under Section 105(a) of the Bankruptcy Code, the business judgment rule, or the Third Circuit "administrative expense" standard, approval of the Bidding Procedures described above are appropriate and necessary to maximizing the value Debtors may obtain for all or portions of their Assets.

42.     The Bidding Procedures are designed to encourage competitive bidding. The Bidding Procedures do not seek a break-up fee (even though such fees are commonly approved by this Court) for the Stalking Horse. Potential purchasers will be afforded the opportunity to submit competing bids modeled on the Purchase Agreement.

43.     Further, the Staking Horse's Bid represents the highest and best bid received at this time and, as such, represents a reasonable floor for other bids upon which other bidders will rely, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

44.     The Minimum Overbid Amount requirements described in the Motion and Bidding Procedures are appropriate under the circumstances as well given the size of this transaction, and the Debtors believe that it is unlikely that they will deter a serious competing bidder.   Consequently, the Debtors believe the Minimum Overbid Amount requirements adequately protect the value provided by the Stalking Horse Bidder

45.     The Minimum Overbid Amount will not diminish the Debtors' estates. Subject to the reservation set forth above regarding an alternate stalking horse bidder, the Bidding Procedures require that the aggregate consideration for a Qualifying Bid must equal or exceed the

Purchase Price provided for under the Purchase Agreement plus the Minimum Overbid Amount. The Minimum Overbid Amount requirements described in the Motion and Bidding Procedures are appropriate under the circumstances as well given the size of this transaction, and the Debtors believe that it is unlikely that they will deter a serious competing bidder. Consequently, the Debtors believe the Minimum Overbid Amount requirements adequately protect the value provided by the Stalking Horse Bidder.

46. Moreover, absent authorization of the Minimum Overbid Amount requirements, the Debtors may lose the opportunity to obtain the highest and best offer for the Assets. If the protections are not approved, the Stalking Horse Bidder is authorized to terminate the Proposed Sale pursuant to **Section 4.4** of the Purchase Agreement.

47. Finally, the Minimum Overbid Amount was negotiated in good faith and were the product of arm's-length negotiations.

48. Accordingly, the Debtors request that the Court authorize payment of the Bidding Procedures and the Minimum Overbid Amount and the other bidder protections.

**B.     *The Sale is Within the Sound Business Judgment of the Debtors
and Should be Approved***

49. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d

DB02:9156875.2                                                            068913.1001

389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991).

50.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, for the reasons detailed more fully above, the Debtors submit that the decision to proceed with the Sale of the Assets and the Bidding Procedures related thereto are based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

51.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a)

provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

52.     The Debtors submit that more than ample business justification exists to sell the Assets to the Successful Bidder (or Back-Up Bidder) pursuant to the Bidding Procedures and on substantially the terms set forth in the Purchase Agreement. The Debtors have insufficient liquidity to continue funding operations indefinitely and the Debtors have not been successful in obtaining postpetition financing other than the DIP Facility that will provide funding for the term of the competitive bidding process. The Debtors believe that it is essential to sell the Assets promptly to avoid a deterioration of their business and a termination of their access to liquidity under the DIP Facility, and submit that the Bidding Procedures and the Auction will generate continued interest and competitive bidding in a manner that will yield the highest and best value for the Assets. Accordingly, the Debtors respectfully submit that the relief sought by this Motion

DB02:9156875.2                                                                                              068913.1001

is not only reasonable, but necessary to maximize the value of the Debtors' estates for the benefit of their stakeholders.

53. The notice described herein and the Bidding Procedures is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets. Accordingly, the Debtors submit that the Proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

54. Moreover, the Bidding Procedures are designed to maximize the value received for the Assets. The process proposed by the Debtors allows for a timely auction process while providing bidders and consultants with ample time and information to submit a timely bid. The Bidding Procedures are designed to ensure that the Assets will be sold for the highest and best value. The Debtors are subjecting the value of the Assets to market testing and permitting prospective purchasers to bid on the Assets. The Proposed Sale will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process in accordance with the Bidding Procedures. Additionally, the Debtors have retained William Blair to assist in the marketing and sale of the Assets. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Assets will be fair and reasonable, and the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

**C.    *The Sale is Proposed in "Good Faith" Under section 363(m) of the Bankruptcy Code***

55. The Debtors request that the Court find that any Successful Bidder (and Back-Up Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

56. Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

57.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Assets. Additionally, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 497-98 (3d. Cir. 1998). In *Krebs*, the Court considered "whether assignments of [certain automobile dealership] franchises under section 365 are also sales of estate property subject to section 363(m)." *Id.* at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in *Krebs* concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in *Krebs*, the Executory Contracts and Leases (as defined below) are executory contracts that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of *Krebs*, the Debtors respectfully submit that section 363(m) applies to protect the Successful Bidder (or Back-Up Bidder) with respect to both the Executory Contracts and Leases (as defined and described more fully below) designated for assumption and assignment and the Assets that are included in such bids.

DB02:9156875.2                                                                           068913.1001

58.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Debtors and the potential purchaser to act in good faith in negotiating the Sale and the assignment of the designated Executory Contracts and Leases (as defined below).  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *Abbotts Dairies*, 788 F.2d at 147.  To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." *Id.* (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).  *See also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W. D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

59.     Here, the sale of the Assets and the assignment of the Executory Contracts and Leases (as defined below) which are designated by the purchaser is in good faith.  There is no evidence of fraud or collusion in the terms of the Sale and the assignment of the Executory Contracts and Leases.  To the contrary, as discussed throughout this Motion, and as will be further demonstrated at the Sale Hearing, the Purchase Agreement will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel.  All negotiations have been and will continue to be conducted on an arms length, good faith basis. With respect to the potential bidders, the Bidding Procedures are designed to ensure that no party

is able to exert undue influence over the process. Under the circumstances, the Successful Bidder (and Back-Up Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Bidding Procedures are designed to prevent the Debtors or the Successful Bidder (or Back-Up Bidder) from engaging in any conduct that would cause or permit the Purchase Agreement or the Sale of the Assets to the Successful Bidder (or Back-Up Bidder) pursuant thereto and hereto, to be avoided under section 363(n) of the Bankruptcy Code.

60.     All parties in interest will receive notice of the Sale and will be provided with an opportunity to be heard. Additionally, all counterparties to Executory Contracts and Leases will be provided notice of the potential assumption and assignment of their agreements and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Sale Order and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

### D.     The Sale Satisfies the Requirements of section 363(f) of the Bankruptcy Code

61.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive;

therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Because the Debtors expect that they will satisfy the requirements of section 363(f) and, thus, entry of an order approving the Sale of the Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

### E.   Credit Bidding under section 363(k) of the Bankruptcy Code Should be Authorized.

62.    A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section 363 of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. §363(k). Even if a secured creditor is under-secured, as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F3d 448, 459-60 (3d Cir. 2006)* (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)").

63.    Pursuant to the Bidding Procedures, Stalking Horse Bidder, as the holder of the two most senior liens on substantially all of Debtors' Assets are entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code.

DB02:9156875.2                                                                                                              068913.1001

Because the Stalking Horse Bidder holds claims that are secured by all of Assets subject to the Stalking Horse Bid, the Debtors submit that the Stalking Horse Bidder should be allowed to credit bid the face value of its secured claims in order to purchase the Assets.

**F.      *Section 363(b)(1) of the Bankruptcy Code Restricting Transfer of Personally Identifiable Information is Not Applicable***

64.      Section 363(b)(1) of the Bankruptcy Code essentially creates protections for the sale or lease of "personally identifiable information[9] by requiring that a sale or lease of such information (a) be consistent with any policy prohibiting the transfer of such information that the debtor has disclosed to an individual or (b) requires the appointment of a "consumer privacy ombudsman" in accordance with section 332 of the Bankruptcy Code and, after a notice and hearing, the court approves such sale "(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law. While the Water Park acquires its customers' credit card account numbers in the ordinary course of business, the Debtors have not disclosed to any individual any policy prohibiting the transfer of personally identifiable information. Accordingly, the Debtors submit that the requirements of section 332(b)(1) of the Bankruptcy Code are inapplicable. [10]

**G.      *Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved***

65.      To facilitate and effectuate the sale of the Assets, the Debtors seek authority to assume and assign various executory contracts and unexpired leases related to the Assets (as may

---

[9]  Section 101(41A) of the Bankruptcy Code defines personally identifiable information of an individual and includes "the account number of a credit card issued to such individual. *See 11 U.S.C. §101(41A)(A)(vi)*.
[10]  Because section 363(b)(1) of the Bankruptcy Code is not applicable, this Motion does not include a request for an order directing the United States Trustee to appoint a consumer privacy ombudsman under section 332 of the Bankruptcy Code as required by Bankruptcy Rule 6004(g).

be identified by separate notice prior to the Sale Hearing, the "Executory Contracts and Leases")
to the Successful Bidder (or the Back-Up Bidder) to the extent required by such Successful
Bidder (or Back-Up Bidder). Section 365 of the Bankruptcy Code authorizes a debtor to assume
and/or assign its executory contracts and unexpired leases, subject to the approval of the
Bankruptcy Court, *provided* that the defaults under such contracts and leases are cured and
adequate assurance of future performance is provided. A debtor's decision to assume or reject an
executory contract or unexpired lease must only satisfy the "business judgment rule" and will not
be subject to review unless such decision is clearly an unreasonable exercise of such judgment.
*Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523
(1943) (applying Bankr. Act section 77 subsection (b), the predecessor to Bankruptcy Code
section 365) (rejecting the test of whether the executory contract was burdensome in favor of
whether rejection is within the debtor's business judgment); *Lubrizol Enter., Inc. v. Richmond
Metal Finishers, Inc.*, 756 F.2d 1043, 1046-47 (4th Cir. 1985).

66.     The meaning of "adequate assurance of future performance" depends on the facts
and circumstances of each case, but should be given "practical, pragmatic construction." *See
Carlisle Homes. Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.
1989). Among other things, adequate assurance may be given by demonstrating the assignee's
financial health and experience in managing the type of enterprise or property assigned. *In re
Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future
performance present when the prospective assignee of a lease from the debtors has the financial
resources and has expressed a willingness to devote sufficient funding to the business in order to
give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future
performance is whether rent will be paid").

DB02:9156875.2                                                                                        068913.1001

67.     The Successful Bidder (or the Back-Up Bidder) may desire to take assignment of certain executory contracts and unexpired leases related to the Assets.  To the extent Executory Contracts and Leases are identified for assumption and assignment by the Successful Bidder (or any Back-Up Bidder), the Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment of the such Executory Contracts and Leases will be satisfied at the Sale Hearing.  The Debtors, as required by the Bidding Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets.  Further, for the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Assets and assuming and assigning to the Successful Bidder (or the Back-Up Bidder) the selected Executory Contracts and Leases would be in the best interests of their estates.  Moreover, the Debtors will provide all parties to the Executory Contracts and Leases an opportunity to be heard pursuant to the assumption and assignment procedures set forth in the Bidding Procedures and Bidding Procedures Order.

68.     Accordingly, the Debtors submit that the implementation of the proposed procedures for the assumption and assignment of the Contracts is appropriate in the Chapter 11 Cases.

**H.     *Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate***

69.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors

request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

70.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988)*. Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

71.     The Debtors hereby request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## <u>NOTICE</u>

72.     The Debtors propose to give notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Stalking Horse Bidder; (iii) counsel to the Debtors' pre- and post-petition secured lenders; (iv) the Internal Revenue Service; (v) counsel to the Committee; (vi) the Office of the United States Attorney for the District of Delaware; and (vii) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: January 19, 2010
Wilmington, Delaware

YOUNG CONAWAY STARGATT AND TAYLOR LLP

Michael R. Nestor (No. 3526)
Donald J. Bowman, Jr. (No. 4383)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Randall D. Crocker (Wis. Bar No. 1000251)
Claire Ann Resop (Wis. Bar No. 1020942)
VON BRIESEN AND ROPER, S.C.
3 South Pinckney Street, Suite 1000
Madison, Wisconsin 53703-4200
Telephone: (608) 441-0300
Facsimile: (608) 441-0301

*Attorneys for the Debtors and Debtors in Possession*