# EXHIBIT B

## PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT

AMONG

KLCG PROPERTY, LLC

AND

GURNEE PROPERTY, LLC,

AS SELLERS,

AND

DOUGHERTY FUNDING LLC,

AS PURCHASER

Dated as of January 19, 2010

# TABLE OF CONTENTS

Page

Article I DEFINITIONS ......................................................................................................2
    1.1        Certain Definitions................................................................................2

Article II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES;
        RELEASE OF CERTAIN CLAIMS ................................................11
    2.1        Purchase and Sale of Assets................................................................11
    2.2        Excluded Assets ..................................................................................12
    2.3        Assumption of Liabilities....................................................................12
    2.4        Excluded Liabilities ............................................................................12
    2.5        Cure Amounts .....................................................................................12
    2.6        Release of Claims ...............................................................................12
    2.7        Further Conveyances and Assumptions................................................13

Article III CONSIDERATION ..........................................................................................13
    3.1        Consideration.......................................................................................13
    3.2        Payment of Purchase Price ..................................................................13

Article IV CLOSING AND TERMINATION ....................................................................13
    4.1        Closing Date ........................................................................................14
    4.2        Deliveries by Sellers ...........................................................................14
    4.3        Deliveries by Purchaser ......................................................................14
    4.4        Termination of Agreement...................................................................15
    4.5        Procedure Upon Termination...............................................................17
    4.6        Effect of Termination...........................................................................17
    4.7        Alternative Stalking Horse Bidder.......................................................17

Article V REPRESENTATIONS AND WARRANTIES OF SELLERS....................................17
    5.1        Sellers' Existence................................................................................17
    5.2        Authority.............................................................................................17
    5.3        Conflicts; Consents of Third Parties....................................................18
    5.4        Financial Advisors ..............................................................................18
    5.5        Reserved..............................................................................................18
    5.6        Employee Controversies......................................................................18
    5.7        No Collective Bargaining Agreements, Union Certifications or
                     Employer Contracts ............................................................................19
    5.8        Notice of Defaults...............................................................................19
    5.9        Environmental Matters ........................................................................19
    5.10      Title.....................................................................................................19
    5.11      Real Property. .....................................................................................20
    5.12      Assigned Contracts.............................................................................20
    5.13      Intellectual Property............................................................................20
    5.14      Permits; Legal Requirements...............................................................21

DB02:9158739.1      068913.1001

| 5.15 | Litigation. | 21 |
|------|-----------|-----|
| 5.16 | Taxes. | 21 |
| 5.17 | Records. | 21 |
| 5.18 | Employees. | 22 |
| 5.19 | Foreign Person. | 22 |
| 5.20 | WARN ACT; COBRA. | 22 |
| 5.21 | No Other Representations or Warranties | 22 |

Article VI REPRESENTATIONS AND WARRANTIES OF PURCHASER ...............22

| 6.1 | Purchaser's Existence | 22 |
|------|-----------|-----|
| 6.2 | Authority | 22 |
| 6.3 | Conflicts; Consents of Third Parties. | 23 |
| 6.4 | Financial Advisors | 23 |
| 6.5 | Sufficient Funds | 24 |
| 6.6 | Condition of the Purchased Assets | 24 |

Article VII BANKRUPTCY COURT MATTERS.................................................24

| 7.1 | Competing Bids | 24 |
|------|-----------|-----|
| 7.2 | Purchaser Protections and Bidding Procedures | 24 |
| 7.3 | Bankruptcy Court Filings. | 25 |

Article VIII COVENANTS ............................................................................25

| 8.1 | Access to Information; Seller's Due Diligence Materials | 25 |
|------|-----------|-----|
| 8.2 | Conduct Pending the Auction and Closing. | 26 |
| 8.3 | Consents. | 27 |
| 8.4 | Regulatory Approvals | 27 |
| 8.5 | Title to Purchased Assets | 28 |
| 8.6 | Further Assurances | 28 |
| 8.7 | Confidentiality. | 28 |
| 8.8 | Preservation of Records | 28 |
| 8.9 | Supplementation and Amendment of Schedules | 29 |
| 8.10 | Publicity | 29 |
| 8.11 | Court Order | 29 |
| 8.12 | Adequate Assurance of Future Performance | 29 |
| 8.13 | Purchaser Covenants After Closing | 30 |
| 8.14 | Approval of Bidding Procedures Order | 30 |
| 8.15 | Casualty Loss. | 30 |
| 8.16 | Eminent Domain. | 30 |
| 8.17 | Use of Name. | 30 |

Article IX CONDITIONS TO CLOSING ...........................................................31

| 9.1 | Conditions Precedent to Obligations of Purchaser | 31 |
|------|-----------|-----|
| 9.2 | Conditions Precedent to Obligations of Sellers | 31 |
| 9.3 | Conditions Precedent to Obligations of Purchaser and Sellers | 32 |
| 9.4 | Frustration of Closing Conditions. | 32 |

Article X NO SURVIVAL................................................................................32

DB02:9158739.1          068913.1001

| 10.1 | No Survival of Representations and Warranties | 32 |
| 10.2 | No Consequential Damages | 32 |

Article XI TAXES ..................................................................................................33

| 11.1 | Transfer Taxes | 33 |
| 11.2 | Intentionally Deleted | 33 |
| 11.3 | Purchase Price Allocation | 33 |
| 11.4 | Cooperation and Audits | 33 |

Article XII MISCELLANEOUS......................................................................................33

| 12.1 | Expenses | 33 |
| 12.2 | Damages and Injunctive Relief | 33 |
| 12.3 | Submission to Jurisdiction; Consent to Service of Process. | 33 |
| 12.4 | Waiver of Right to Trial by Jury | 34 |
| 12.5 | Entire Agreement; Amendments and Waivers | 34 |
| 12.6 | Governing Law | 34 |
| 12.7 | Notices | 34 |
| 12.8 | Severability | 35 |
| 12.9 | Binding Effect; Assignment | 36 |
| 12.10 | Non-Recourse | 36 |
| 12.11 | Counterparts | 36 |
| 12.12 | Time of the Essence; Calculation of Time Period | 36 |
| 12.13 | United States Dollars | 37 |
| 12.14 | Exhibits/Schedules | 37 |
| 12.15 | Gender and Number | 37 |
| 12.16 | Headings | 37 |
| 12.17 | Certain Terminology | 37 |
| 12.18 | Negotiations | 37 |

DB02:9158739.1          068913.1001

## Exhibits

| | |
|---|---|
| A | Purchased Assets |
| B-1 | Legal Description of the Land |
| B-2 | Permitted Encumbrances |
| C | Assigned Contracts |
| D | Excluded Assets |
| E | Licensed Assets |
| F | Intellectual Property |
| G | Knowledge Parties |
| H | Deed |
| I | Bill of Sale |
| J | Assignment and Assumption Agreement |
| K | Due Diligence Materials |
| L | Bidding Procedures Order |
| M | Closing Conditions |
| N | Sale Order |
| O | Financial Advisors |
| P | Inventory of Personal Property |

## Schedules

| | |
|---|---|
| 5.6 | Employee Controversies |
| 5.7 | Collective Bargaining Agreements and Employment Contracts |
| 5.9 | Environmental Exceptions |
| 5.14 | Permits |
| 5.15 | Litigation |
| 5.16 | Taxes |

DB02:9158739.1          068913.1001

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "***Agreement***") is made and entered into as of this 19th day of January, 2010 (the "***Execution Date***") by and among DOUGHERTY FUNDING LLC, a Delaware limited liability company ("***Dougherty***" and together with its permitted successors and assigns, "***Purchaser***"), KLCG PROPERTY, LLC, a Delaware limited liability company and debtor-in-possession ("***KLCG Property***"), and Gurnee Property, LLC, an Illinois limited liability company and debtor in possession ("**Gurnee Property**"; and together with KLCG Property being each a "**Seller**" and collectively the "**Sellers**"). Dougherty may assign this Agreement in accordance with **Section 12.9** hereof at any time prior to the Closing.

## RECITALS:

A.    Sellers are engaged in the business (the "***Business***") of owning and operating a 414-room destination resort hotel, restaurants and other food services, indoor water park and conference center (the "***Facility***" or the "***Water Park***") located north of Chicago in Gurnee, Illinois and located on the land (the "***Land***" or the "***Premises***") described on **Exhibit B-1** attached hereto located in Lake County, Illinois.

B.    Sellers are debtors and debtors-in-possession under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq.* (the "***Bankruptcy Code***") having commenced voluntary cases (Nos. 09-14418 (KJC) (Jointly Administered)) (such cases being referred to herein as the "***Bankruptcy Case***") on December 16, 2009 (the "***Petition Date***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***").

C.    Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their business and manage their properties, and administer their estate created by Section 541 of the Bankruptcy Code on the Petition Date as debtors-in-possession (collectively, or individually as the context may require, the "***Estate***").

D.    Each Seller is a Debtor and Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities, all as more specifically provided herein.

E.    Following consultation with its financial advisors and reasonable due diligence, the board of directors of Sellers have determined that subject to (1) the conduct of a full, fair and open Auction, (ii) sufficient notice of the proposed transaction and (2) approval of the transactions contemplated by this Agreement by the Bankruptcy Court under Sections 105, 363 and 365 of the Bankruptcy Code, it is, in light of the current circumstances, in the best interests of the Estate and the beneficiaries of such Estate to consummate the transactions contemplated by this Agreement, upon the terms and conditions set forth herein;

F.    Dougherty has determined that it is advisable and in its best interests to consummate, and has approved, the transactions contemplated by this Agreement, upon the terms and conditions set forth herein.

G.     On or before January 19, 2010 Sellers will file the Sale Motion in the Bankruptcy Case requesting, *inter alia*, authorization to (1) enter into this Agreement and (2) sell and transfer the Purchased Assets and Assumed Liabilities to Purchaser, subject to Sellers' solicitation and receipt of higher and/or better offers consistent with **Article VII** hereof.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**1.1     Certain Definitions**.  For purposes of this Agreement, the following terms shall have the meanings specified in this **Section 1.1**:

"*Accounts Receivable*" means all of Sellers' accounts (as such term is defined in the UCC) and includes, without limitation, all of Sellers' trade accounts, credit card receivables and all other accounts receivable of the Sellers as of the Closing arising out of the sale or other disposition of goods or rendition of services prior to the Closing.

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"*Alternative Transaction*" means a transaction or plan of reorganization involving (whether in one or more steps or separate transactions) a disposition of all or any substantial portion of the Purchased Assets, whether directly or indirectly, through a sale of equity (by merger, consolidation or otherwise) or in consideration of the claims or liens of creditors of Sellers, to a Person or Persons other than Purchaser or any of its Affiliates.

"*Approved Budget*" has the meaning ascribed to it in the Interim Order or, upon the entry of the Final Order, the Final Order.

"*Approved Budget Expense*" has the meaning ascribed to it in the Interim Order or, upon the entry of the Final Order, the Final Order.

"*Assigned Contracts*" means all of the Contracts listed on **Exhibit C** to be assumed by Sellers and assigned to Purchaser under Section 365 of the Bankruptcy Code, as such exhibit may be amended from time to time prior to Closing pursuant to **Section 2.l(b)(ii)**.

"*Assignment and Assumption Agreement*" means the Assignment and Assumption Agreement substantially in the form attached hereto as **Exhibit J**.

"***Assumed Liabilities***" has the meaning ascribed to it in **Section 2.3**.

"***Auction***" has the meaning ascribed to it below in the definition of Bidding Procedures Order in **Section 1.1**.

"***Avoidance Claims***" means all claims and causes of action under Chapter 5 of the Bankruptcy Code.

"***Bankruptcy Case***" has the meaning ascribed to it in the Recitals.

"***Bankruptcy Code***" has the meaning ascribed to it in the Recitals.

"***Bankruptcy Court***" has the meaning ascribed to it in the Recitals.

"***Bid Deadline***" has the meaning ascribed to it in the Bidding Procedures.

"***Bidding Procedures***" has the meaning ascribed to it in **Section 7.2(b)**.

"***Bidding Procedures Order***" means an order of the Bankruptcy Court, substantially in the form attached hereto as **Exhibit L**, including such non-substantive changes thereto as are reasonably acceptable to Purchaser and Sellers, that, among other things, establishes a date by which Competing Bids must be submitted by bidders and establishes procedures for an auction process (the "***Auction***").

"***Bill of Sale***" means the Bill of Sale in substantially the form attached hereto as **Exhibit I**.

"***Business***" has the meaning ascribed to it in the Recitals.

"***Business Day***" means any day of the year on which national banking institutions in Minneapolis are open to the public for conducting business and are not required or authorized to close.

"***Carve-Out***" shall mean the carve-out set forth in Section 9 of the Interim Order or, upon the entry of the Final Order, the corresponding provision of the Final Order.

"***Chapter 11 Expenses***" means the costs incurred and expenses paid or payable by Sellers in connection with the administration of the Bankruptcy Case, including (a) obligations to pay professionals' fees and expenses in connection with the Bankruptcy Case (including fees of attorneys, accountants, investment bankers, financial advisors and consultants retained by Sellers, the Creditors' Committee, the prepetition lenders, or any other official committee appointed in the Bankruptcy Case and any compensation for making a substantial contribution in the Bankruptcy Case) and reimbursement of any expenses incurred by Sellers prior to the Closing Date in connection therewith (including any obligations to pay any holdback of any such fees and expenses), (b) fees and expenses payable to the United States trustee under Section 1930 of Title 28 of the United States Code, and (c) expenses of members of the Creditors' Committee.

"***Claims***" has the meaning ascribed to it on **Exhibit A**.

"***Closing***" has the meaning ascribed to it in **Section 4.1**.

"***Closing Date***" has the meaning ascribed to it in **Section 4.1**.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Commercial Tort Claims***" means all of Sellers' commercial tort claims (as such term is defined in the UCC).

"***Competing Bid***" has the meaning ascribed to it in **Section 7.1**.

"***Confidential Information***" has the meaning ascribed to it in **Section 8.7**.

"***Contract***" means any written contract, indenture, note, bond, lease or other agreement.

"***Cure Amounts***" shall have the meaning ascribed to it in **Section 2.5.**

"***Damages***" means any and all losses, damages, claims, demands, causes of action, suits or judgments of any nature, costs and expenses (including reasonable fees and expenses of attorneys).

"***Debtor***" or "***Debtors***" means, individually or collectively, as the case may be, KLCG Property and Gurnee Property, as debtors and debtors-in-possession in the Bankruptcy Case under the Bankruptcy Code.

"***Deed***" means the deed transferring title to the Real Property in substantially the form of **Exhibit H**.

"***Deposit Accounts***" means all of Sellers' deposit accounts (as such term is defined in the UCC).

"***DIP Facility***" has the meaning ascribed to it on Exhibit A to the DIP Financing Motion and incorporated by reference into the Interim Order or, upon the entry of the Final Order, the Final Order.

"***DIP Facility Collateral***" has the meaning ascribed to it in the Interim Order or, upon the entry of the Final Order, the Final Order.

"***DIP Financing Motion***" means the Debtors' Motion For Entry of Interim and Final Orders: (I) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and With Administrative Super Priority; (II) Granting Liens; (III) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. Section 363 and Providing for Adequate Protection; (IV) Modfying the Automatic Stay; and (V) Scheduling a Final Hearing filed with the Bankruptcy Court on December 16, 2009.

-4-

"***DIP Indebtedness***" has the meaning ascribed to it on Exhibit A to the DIP Financing Motion and incorporated by reference into the Interim Order or, upon the entry of the Final Order, the Final Order.

"***DIP Lender***" means Dougherty Funding LLC, in its capacity as the "DIP Lender" pursuant to the Interim Order or, upon the entry of the Final Order, the Final Order, and the Postpetition Loan Documents.

"***DIP Loan Agreement***" has the meaning ascribed to it in the Interim Order or, upon the entry of the Final Order, the Final Order.

"***DIP Loan Documents***" has the meaning ascribed to it on Exhibit A to the DIP Financing Motion and incorporated by reference into the Interim Order or, upon the entry of the Final Order, the Final Order.

"***Effective Date***" means January 19, 2010, the date of this Agreement.

"***Environmental Law***" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. §6901 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §1802 et seq.; the Toxic Substances Control Act, 15 U.S.C. §2601 et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq.; the Clean Water Act, 33 U.S.C. §1321 et seq.; the Clean Air Act, 42 U.S.C. §7401 et seq.; and any other federal, state, county, municipal or local statute, law, ordinance or regulation which relates to or deals with human health or the environment, all as may from time to time be amended from time to time, or any successor statute, law, ordinance or regulation.

"***Environmental Report***" means that certain Phase I Environmental Site Assessment respecting the Premises dated October 16, 2006, as revised on November 27, 2006, on December 18, 2006, December 28, 2006 and February 1, 2007, conducted by GILES Engineering Associates, Inc. addressed to KeyLime Cove of Gurnee LLC and Prepetition Senior Lender and its participants, all previously furnished to Prepetition Senior Lender.

"***Equipment***" means all of Sellers' equipment (as such term is defined in the UCC) and includes, without limitation, all furniture, trade fixtures, equipment, machinery, computer hardware, computer software (to the extent assignable), any spare parts and other tangible personal property owned by Sellers and used in the Business or in connection with the Facility other than Inventory.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute, together with regulations thereunder.

"***ERISA Affiliate***" means any trade or business (whether or not incorporated) that is a member of a group of which any Seller is a member and which is treated as a single employer under Section 414 of the Code.

"***ERISA Plan***" means an employee benefit plan or other plan maintained for employees of any Seller or of any ERISA Affiliate, and subject to Title IV of ERISA or Section 412 of the Code.

"***Estate***" has the meaning ascribed to it in the Recitals.

"***Excluded Assets***" has the meaning ascribed to it in **Section 2.2**.

"***Excluded Contracts***" shall mean the Contracts described on Section 2.2, and shall also be deemed to include those Assigned Contracts which Purchaser may elect to exclude from the Purchased Assets from time to time pursuant to **Section 2.1(b)**.

"***Facility***" has the meaning ascribed to it in the Recitals.

"***Final Order***" has the meaning ascribed to it in the Interim Order.

"***Fixtures***" means all of Sellers' fixtures (as such term is defined in the UCC).

"***GAAP***" means United States generally accepted accounting principles as in effect on the date in which the document to which it refers relates, applied on a consistent basis throughout the periods covered thereby.

"***General Intangibles***" means all of Seller's general intangibles (as such term is defined in the UCC).

"***Governmental Body***" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"***Ground Lease***" means the Triple Net Land Lease dated December 22, 2006, between Gurnee Property, as lessor, and KLCG Property, as lessee, whereby Gurnee Property has ground leased a portion of the Premises to KLCG Property, and all amendments thereto.

"***Gurnee Property***" has the meaning ascribed to it in the preamble hereto.

"***Hazardous Substances***" means any substance, material or constituent defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical waste, material or substance, including, without limitation, urea formaldehyde, polychlorinated biphenyls, dioxin, radon, mold, lead, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, carcinogens and petroleum products (including, without limitation, crude oil or any fraction thereof), methane gas, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material substance, pollutant or contaminant which would subject any Seller to any damages, penalties or liabilities under any applicable Environmental Law.

DB02:9158739.1          068913.1001

"***Improvements***" means the hotel and indoor water park on the Land and all structures, other improvements, Fixtures and other Personal Property (other than Inventory and Equipment not comprising Fixtures) now standing, constructed or placed upon the Land.

"***Intellectual Property***" means any and all patents and patent applications; trademarks, service marks, trade names, brand names, trade dress, slogans, logos and domain names, and the goodwill associated with any of the foregoing; inventions (whether patentable or not), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, data collections, drawings, blueprints, mask works, devices, methods, techniques, processes, know-how, proprietary information, customer lists, software, technical information and trade secrets; copyrights, copyrightable works, and rights in databases and data collections; moral and economic rights of authors and inventors; other intellectual or industrial property rights and foreign equivalent or counterpart rights and forms of protection of a similar or analogous nature to any of the foregoing or having similar effect in any jurisdiction throughout the world; and registrations and applications for registration of any of the foregoing, including any renewals, extensions, continuations (in whole or in part), divisionals, re-examinations or reissues or equivalent or counterpart thereof; and all documentation and embodiments of the foregoing, including all such property owned by or licensed to any Seller.

"***Interim Order***" means the Interim Order entered by the Bankruptcy Court on December 17, 2009, pursuant to 11 U.S.C. Sections 105, 361, 362, 363 And 364 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure: (I) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and With Administrative Super Priority; (II) Granting Liens; (III) Authorizing Use of Cash Collateral by the Debtors pursuant to 11 U.S.C. Section 363 and Providing for Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Scheduling a Final Hearing.

"***Inventory***" means all of Sellers' inventory (as such term is defined in the UCC) wherever located on the Closing Date, except for any liquor inventory unless Purchaser holds the requisite license therefor and any other inventory that Purchaser identifies as not being a Purchased Asset (which excluded Inventory shall be an Excluded Asset).

"***KLCG Property***" has the meaning ascribed to it in the preamble hereto.

"***Knowledge of Sellers***" means the actual knowledge of those individuals identified on **Exhibit G** as Sellers' Knowledge Parties.

"***Knowledge of Purchaser***" means the actual knowledge of those individuals identified on **Exhibit G** as Purchasers' Knowledge Parties.

"***Land***" has the meaning ascribed to it in the Recitals.

"***Law***" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"***Legal Requirements***" means all restrictions, laws, statutes, codes, ordinances, rules and regulations of any Governmental Body applicable to Sellers or all or any part of the Facility or its use and occupancy.

"***Legal Proceeding***" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"***Licensed Assets***" means the Sellers' property identified on **Exhibit E**.

"***Lien***" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind, including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof and the filing of or agreement to give any financing statement under the UCC of any jurisdiction and including any lien or charge arising by statute or other laws, which secures the payment of a debt (including, without limitation, any Tax) or the performance of an obligation.

"***Manager***" means S&L Hospitality, LLC, current manager of the Facility for KLCG Property.

"***Material Adverse Effect***" means any change or event that has had, or would reasonably be expected to have, a materially adverse effect on the Purchased Assets taken as a whole or on the liens granted under the Interim Order or Final Order, as the case may be.

"***Order***" means: (a) with respect to the Bankruptcy Case, the Interim Order or the Final Order, as applicable; and (b) any other order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"***Ordinary Course of Business***" means any action taken by a Person if, and only if, such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

"***Permitted Encumbrances***" means with respect to: (a) the Land and the Improvements: (i) the easements, encroachments or similar reservations, restrictions or burdens or other Liens described on **Exhibit B-2**; (ii) any Lien that Purchaser agrees in writing to accept; or (b) the Personal Property, any Lien that the Purchaser agrees in writing to accept.

"***Permits***" means all transferable licenses, permits, certificates of authority, authorizations, approvals, registrations and similar consents granted or issued by any Governmental Body to any Seller and necessary for the operation of the Facility or the Business in the Ordinary Course of Business.

"***Person***" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

-8-

"**_Personal Property_**" means any Seller's interest in (a) all Fixtures, Equipment and other tangible personal property which are used or useful in the ownership, operation, maintenance or management of the Facility, including, without limitation, those items set forth on the attached **Exhibit P**, (b) all books, records, computer files, software and files relating to the operation, maintenance or management of the Facility, (c) all Permits with respect to the Facility, (d) all service, maintenance, management or other agreements relating to the operation, maintenance or management of the Facility other than Excluded Contracts, (e) all warranties or guaranties, plans and specifications, surveys, environmental, engineering and soil tests, reports and studies, (f) all signs, brochures, marketing and advertising materials, mailing lists and customer lists relating to the Facility, (g) all Intellectual Property, (h) addresses and telephone numbers, if any, owned and used by any Seller with respect to its ownership and operation of the Facility, and (i) all keys, passcards or passcodes to all locks for the Premises, (j) except that this definition of "Personal Property" shall not include any property owned by the Manager or any Excluded Assets.

"**_Petition Date_**" has the meaning ascribed to it in the Recitals.

"**_Premises_**" has the meaning ascribed to it in the Recitals.

"**_Prepetition Senior Collateral_**" has the meaning ascribed to it in the Interim Order or, upon the entry of the Final Order, the Final Order.

"**_Prepetition Senior Lender_**" means Dougherty Funding LLC, in its capacity as the "Prepetition Senior Lender" as defined on Exhibit A to the DIP Financing Motion and incorporated by reference into the Interim Order or, upon the entry of the Final Order, the Final Order, and the Postpetition Loan Documents.

"**_Prepetition Senior Loan Agreement_**" has the meaning ascribed to it in the Interim Order or, upon the entry of the Final Order, the Final Order.

"**_Prepetition Senior Loan Documents_**" has the meaning ascribed to it on Exhibit A to the DIP Financing Motion and incorporated by reference into the Interim Order or, upon the entry of the Final Order, the Final Order.

"**_Prepetition Senior Obligations_**" has the meaning ascribed to it on Exhibit A to the DIP Financing Motion and incorporated by reference into the Interim Order or, upon the entry of the Final Order, the Final Order

"**_Prevailing Bidder_**" means the Person making the highest or otherwise best offer to purchase the Purchased Assets pursuant to the Bidding Procedures, or, if such Person fails to close the transaction, the Person whose offer is accepted pursuant to the Bidding Procedures.

"**_Purchase Price_**" has the meaning ascribed to it in **Section 3.1**.

"**_Purchased Assets_**" has the meaning ascribed to it in **Section 2.1**.

"***Purchaser***" has the meaning ascribed to it in the preamble hereto.

"***Purchaser Cure Amounts***" has the meaning ascribed to it in **Section 3.1**.

"***Purchaser Documents***" has the meaning ascribed to it in **Section 6.2**.

"***Qualifying Bid***" means a bid which meets the criteria set forth in **Exhibit L-1**, as applicable.

"***Qualifying Bidder***" has the meaning ascribed to it in **Exhibit L-1**.

"***Real Property***" means collectively, the Premises, the Improvements, Sellers' interests under the Ground Lease, and all other real property leased, owned or operated by any Seller.

"***Release***" means the Release and Covenant Not to Sue, substantially in the form of **Exhibit M** hereto.

"***Sale Hearing***" means the hearing before the Bankruptcy Court to consider Sellers' motion for entry of the Sale Order.

"***Sale Motion***" means the motion (including such amendments and supplements as are acceptable to Purchaser and Sellers) of Sellers seeking approval from the Bankruptcy Court for entry of the Bidding Procedures Order and Sale Order.

"***Sale Order***" shall be an Order or Orders of the Bankruptcy Court substantially in the form attached hereto as **Exhibit N**, including such non-substantive changes thereto as are reasonably acceptable to Purchaser and Sellers, approving this Agreement and all of the respective terms and conditions hereof, and approving and authorizing Sellers to consummate the transactions contemplated hereby.

"***Seller***" or "***Sellers***" has the meaning ascribed to it in the Recitals.

"***Seller Documents***" has the meaning ascribed to it in **Section 5.2**.

"***Subsidiary***" with respect to an entity means any Person in which such entity, directly or indirectly, beneficially owns more than fifty percent (50%) of either the equity interests in, or the voting control of, such Person.

"***Tax Authority***" means any federal, state, local or foreign government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"***Tax Return***" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"***Taxes***" means (a) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales,

-10-

use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (b) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (a).

"***Termination Date***" has the meaning ascribed to it in **Section 4.4(a)**.

"***Transfer Taxes***" has the meaning ascribed to it in **Section 11.1**.

"***UCC***" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Illinois.

"***WARN Act***" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor law, and the rules and regulations promulgated thereunder and under any successor law, and any similar state, local or foreign law, regulation or ordinance.

"***Water Park***" has the meaning ascribed to it in the Recitals.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES; RELEASE OF CERTAIN CLAIMS

### 2.1 Purchase and Sale of Assets.

(a)     **Purchased Assets**.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall, in accordance with and subject to the Sale Order, sell, transfer, assign, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Purchased Assets.  "***Purchased Assets***" shall mean the assets of Sellers listed on **Exhibit A** (but excluding Excluded Assets) as of the Closing.

(b)     **Assigned Contracts**.

(i)     The Purchased Assets shall include the Assigned Contracts which Sellers shall assume and assign to the Purchaser pursuant to Section 365 of the Bankruptcy Code.  Purchaser shall assume the obligations of Sellers under the Assigned Contracts arising from and after the Closing Date and shall, subject to **Section 2.5**, pay any Cure Amounts associated therewith.

(ii)     At any time and from time to time from the date hereof through the date that is one (1) Business Day prior to the Closing, Purchaser shall have the right, by written notice to Sellers, either (A) designate any Contract not already so designated to be an Assigned Contract, or (B) remove any Contract from **Exhibit C**.  **Exhibit C** shall be amended to include or remove any such Contract as an Assigned Contract.  Any Assigned Contract removed from **Exhibit C** shall

-11-

no longer be an Assigned Contract and shall instead be deemed an Excluded Contract for purposes of this Agreement. Purchaser may also elect to take assignment of one or more of the Other Contracts described as such on **Exhibit C** for up to thirty (30) days after the Closing (the "***DF Assumed Contracts***"). Upon designation of such DF Assumed Contracts, the Debtors will file with the Bankruptcy Court and serve a notice (the "***DF Assumption Notice***", substantially in the form of said Exhibit G attached to the Bidding Procedure Order on the non-debtor counterparties to the DF Assumed Contracts that identifies the Purchaser as the purchaser of the Assets and provides notice that the Sellers are assuming and assigning the DF Assumed Contracts to the Purchaser.

**2.2**   **Excluded Assets**. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "***Excluded Assets***" shall mean the assets, properties, interests and rights of Sellers (which in no event shall be deemed to include any of the Purchased Assets) set forth on **Exhibit D**. At any time and from time to time from the date hereof through the date that is one (1) Business Day prior to the Closing, Purchaser shall have the right, by written notice to Seller, to designate any asset of any Seller as an Excluded Asset. Any Excluded Asset added to **Exhibit D** shall no longer be part of the Purchased Assets and shall instead be deemed an Excluded Asset for purposes of this Agreement.

**2.3**   **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, (a) all of Sellers' liabilities and obligations arising from and after the Closing Date under the Assigned Contracts, and (b) the Cure Amounts (collectively, the "***Assumed Liabilities***").

**2.4**   **Excluded Liabilities**. Except as specified in the foregoing **Section 2.3**, Purchaser does not assume any other liabilities or obligations of any Seller.

**2.5**   **Cure Amounts**. Purchaser agrees to satisfy, as of the Closing Date or such later date as the Bankruptcy Court may permit, all cure obligations due and owing under the Assigned Contracts which the Bankruptcy Court orders to be paid as a condition to Sellers' assumption and assignment to Purchaser of the Assigned Contracts pursuant to and in accordance with Section 365 of the Bankruptcy Code (collectively, the "***Cure Amounts***" and individually a "***Cure Amount***"); *provided, however*, that the non-debtor party to any Assigned Contract may agree to a lesser amount. In addition, Purchaser shall be responsible to pay all amounts arising from and after the Closing Date under each Assigned Contract, and shall provide adequate assurance of future performance, where applicable.

**2.6**   **Release of Claims**. Sellers, and each of them, shall agree, subject to the terms and conditions of this Agreement and entry of a Sale Order approving the Purchase Agreement and the Release, effective as of the Closing Date, not to sue Purchaser on account of, and to release Purchaser from, any and all rights, claims or causes of action of Sellers against Purchaser relating to the assets, properties, business or operations of Sellers arising out of events occurring on or prior to the Closing Date, including, but not limited to, any Commercial Tort Claims and Avoidance Claims, but specifically excluding Sellers' rights, claims or causes of action in

-12-

connection with this Agreement and related documents, as such are described in clause (b) of **Exhibit D**. To effect the foregoing, at the Closing, Sellers shall execute and deliver to Purchaser the Release.

**2.7** **Further Conveyances and Assumptions**. From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents and to assure fully to Sellers and the successors and assigns thereof, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby. [Cooperate in the orderly transfer of ownership and management of the Business, transfer or re-issue of licenses, etc.]

# ARTICLE III

# CONSIDERATION

**3.1** **Consideration.** The initial purchase price of the Purchased Assets hereunder (the "*Purchase Price*") is estimated to be $65,000,000 in addition to the Cure Amounts paid by the Purchaser hereunder and shall be equal to the sum of: (a) all Prepetition Senior Obligations owing to Prepetition Senior Lender pursuant to the Prepetition Senior Loan documents as of the Closing Date (including all outstanding principal, accrued but unpaid interest at the applicable rate set forth in the Prepetition Senior Loan Documents, and all fees, costs and charges properly chargeable under the Prepetition Senior Loan Documents, including all attorneys' fees and legal expenses through (and including) the Closing Date), plus (b) all DIP Indebtedness owing to DIP Lender pursuant to the DIP Loan Documents (including all outstanding principal, accrued but unpaid interest at the applicable rate set forth in the DIP Loan Documents, and all fees, costs and charges properly chargeable under the DIP Loan Documents, including all attorneys' fees and legal expenses through (and including) the Closing Date). As additional consideration for the Purchased Assets, Purchaser shall also pay the balance of the fee due William Blair & Company in connection with the sale of the Purchased Assets to Purchaser.

**3.2** **Payment of Purchase Price**. The Purchase Price shall be paid by the Purchaser pursuant to a Bankruptcy Code Section 363(k) credit bid. If, at the Auction, Purchaser bids more than the sum of the DIP Indebtedness, the Prepetition Senior Obligations and the Assumed Liabilities and Cure Amounts and Purchaser is the Prevailing Bidder, then Purchaser shall pay such additional amount to Sellers in cash on the Closing Date by wire transfer of immediately available funds into an account or accounts as designated by Sellers.

# ARTICLE IV

# CLOSING AND TERMINATION

-13-

4.1	**Closing Date**.  Subject to the satisfaction of the conditions set forth in **Sections 9.1**, **9.2** and **9.3** hereof (or the waiver thereof by the party entitled to waive any such condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in **Article II** hereof (the "***Closing***") shall take place, and Purchaser and Sellers shall consummate the purchase and sale transaction contemplated hereby, at the offices of Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, Minnesota (or at such other place as the parties may designate in writing) at 10:00 a.m. (Central time) on the date that is not more than two (2) Business Days following the satisfaction or waiver of the conditions set forth in **Sections 9.1**, **9.2** and **9.3** hereof (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "***Closing Date***."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers in respect of the Purchased Assets to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 9:00 a.m. (Central time) on the Closing Date.  All room revenues for the evening of the day prior to the Closing Date shall accrue to the benefit of KLCG Property, all customer charges for the period from and after 9:00 a.m. shall accrue to the benefit of Purchaser.

4.2	**Deliveries by Sellers**.  At the Closing, each Seller shall deliver to Purchaser:

(a)	a duly executed Deed;

(b)	a duly executed Bill of Sale;

(c)	a duly executed Assignment and Assumption Agreement;

(d)	the officer's certificates required to be delivered pursuant to **Sections 9.1(a)** and **9.1(a)**;

(e)	all other instruments of assignment, conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets and Assumed Liabilities to Purchaser;

(f)	a duly executed customary title insurance affidavit;

(g)	a duly executed Release, pursuant to **Section 2.6**;

(h)	a certificate of the non-foreign status of each Seller in the form required by Treasury Section 1.1445-2(b); and

(i)	such other documents, instruments and certificates as Purchaser may reasonably request.

4.3	**Deliveries by Purchaser**.  At the Closing, Purchaser shall deliver:

-14-

(a)     as promptly as is reasonably practicable and otherwise in accordance with the Bankruptcy Court orders, the Cure Amounts to counterparties of Assigned Contracts pursuant to this Agreement and Section 365 of the Bankruptcy Code;

(b)     to the Sellers:

(i)     any cash consideration as set forth in **Section 3.2** hereof;

(ii)     the officer's certificate required to be delivered pursuant to **Sections 9.2(a)** and **9.2(b)**;

(iii)     a duly executed Assignment and Assumption Agreement; and

(iv)     such other documents, instruments and certificates as Sellers may reasonably request.

**4.4     Termination of Agreement**.  This Agreement may be terminated prior to the Closing as follows:

(a)     by either Purchaser or Sellers:

(i)     if the Closing shall not have occurred by the close of business on March 31, 2010 or such later date mutually agreed upon in writing by the Sellers and the Purchaser (the "***Termination Date***"); *provided, however*, that, if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order and if all other conditions to the respective obligations of the parties to close hereunder that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no party may terminate this Agreement prior to April 30, 2010 or such later date mutually agreed upon in writing by the Sellers and the Purchaser; *provided, further*, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Sellers, then the breaching party may not terminate this Agreement pursuant to this **Section 4.4(a)(i)**;

(ii)     by mutual written consent of Sellers and Purchaser;

(iii)     if the Bankruptcy Court declines to enter the Bidding Procedures Order;

(iv)     if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(v)     if the Bankruptcy Court enters an Order dismissing the Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee or examiner, *provided*, that the Sellers may not terminate under this **Section 4.4(a)(v)** if such Order was requested, encouraged or

supported by Sellers; or

(vi)    if Sellers enter into any agreement for an Alternative Transaction.

(b)    by Purchaser:

(i)    if any of the conditions to the obligations of Purchaser set forth in **Sections 9.1** or **9.3** shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(ii)    if there shall be a breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in **Sections 9.1** or **9.3** or a breach in the Bidding Procedures Order or the Sale Order and which breach cannot be cured or has not been cured by the earlier of (A) twenty (20) Business Days after the giving of written notice by Purchaser to Sellers of such breach and (B) the Termination Date;

(iii)    if Purchaser is not the Prevailing Bidder at the Auction; *provided*, that if Purchaser is the only back-up Bidder, the Purchaser shall not be permitted to terminate this Agreement pursuant to this **Section 4.4(b)(iv)** until after the earlier of (A) the closing of an Alternative Transaction; or (B) April 30, 2010; *provided, further,* that Purchaser shall be permitted to terminate this Agreement pursuant to this **Section 4.4(b)(iv)** only if Purchaser is not in material breach of any of its representations, covenants or agreement contained herein.

(c)    by Sellers:

(i)    if any condition to the obligations of Sellers set forth in **Sections 9.2** or **9.3** shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(ii)    if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement or a breach in the Bidding Procedures Order or the Sale Order which would result in a failure of a condition set forth in **Sections 9.2** or **9.3** and which breach cannot be cured or has not been cured by the earlier of (A) twenty (20) Business Days after the giving of written notice by Sellers to Purchaser of such breach and (B) the Termination Date;

(iii)    if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby where such Order was requested, encouraged or supported by Purchaser; or

(iv)    if Purchaser is not the Prevailing Bidder at the Auction.

-16-

**4.5    Procedure Upon Termination**.  In the event of termination by Purchaser or Sellers, or both, pursuant to **Section 4.4** hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Sellers.  If this Agreement is terminated as provided herein each party shall redeliver to the party furnishing the same or destroy all confidential non-public documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof.

**4.6    Effect of Termination**.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Sellers; *provided, however,* that the rights and obligations of the parties set forth in **Section 7.2** and **Section 8.7** hereof shall survive any such termination and shall be enforceable hereunder.

**4.7    Alternative Stalking Horse Bidder**.  By no later than fifteen (15) Business Days prior to the Bid Deadline, Sellers may propose that the Purchaser agree to defer its right to purchase the Purchased Assets to a Qualified Bidder (an "***Alternative Stalking Horse Bidder***") as the purchaser of substantially all of the Purchased Assets for the purpose of establishing a minimum acceptable cash bid (the "***Alternative Stalking Horse Bid***") pursuant to an Alternative Stalking Horse Purchase Agreement with which to begin the Auction.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, hereby represent and warrant to Purchaser that:

**5.1    Sellers' Existence**.  Each Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of its organization and has all requisite limited liability company power and authority to own, lease and operate its properties, to carry on the Business as now conducted and to perform its obligations under this Agreement and the Seller Documents.  Neither Seller has any Subsidiaries.

**5.2    Authority**.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), each Seller has all requisite limited liability company power, authority and legal capacity to execute and deliver this Agreement and has all requisite limited liability company power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement to which such Seller is a party or to be executed by such Seller in connection with the consummation of the transactions contemplated by this Agreement (the "***Seller Documents***"), to perform its respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of each Seller a party hereto and thereto.  This Agreement has been, and each of the Seller Documents will be at or prior to the

-17-

Closing, duly and validly executed and delivered by each Seller a party hereto and thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Sellers' obligations under **Section 7.1**, the entry of an Order of the Bankruptcy Court approving such obligations) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, now or hereafter in effect, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

### 5.3 Conflicts; Consents of Third Parties.

(a) To the Knowledge of Sellers, none of the execution and delivery by any Seller of this Agreement or by any Seller a party thereto of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of formation, member control agreement, limited liability company agreement, operating agreement or comparable organizational documents of each Seller; (ii) subject to entry of the Sale Order, any applicable Law or any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (iii) subject to entry of the Sale Order, any applicable Law.

(b) To the Knowledge of Sellers, no consent, waiver, approval, Order, permit or authorization of, or declaration or filing with, or notification to, any Governmental Body is required on the part of Sellers in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Sellers of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, (ii) the entry of the Bidding Procedures Order; and (iii) any required approval of the City of Gurnee of the transfer or issuance to Purchaser of a liquor license for the Business.

**5.4** **Financial Advisors**.  Except as set forth on **Exhibit O**, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers or any of their Subsidiaries in connection with the transactions contemplated by this Agreement and no Person engaged by Sellers is entitled to any fee or commission or like payment from Purchaser in respect thereof.

**5.5** **Reserved**.

**5.6** **Employee Controversies**.  Except as set forth on **Schedule 5.6**, there are no complaints filed or threatened, or outstanding orders or charges, against any Seller under any applicable Law relating to occupational safety and health.  Any levies, assessments, and penalties

made against any Seller pursuant to applicable Law relating to occupational safety and health have been paid in full.

**5.7** **No Collective Bargaining Agreements, Union Certifications or Employer Contracts**. To the Knowledge of Sellers, except as set forth on Schedule 5.7, with respect to employees of each Seller, there are no (a) collective bargaining agreements in effect, (b) union certifications or applications for union certification outstanding, (c) union organizing drives, (d) voluntary recognitions of any union as the bargaining agent for any such employees, or (e) material labor disputes, grievances, strikes, or lockouts, pending or threatened. Except as set forth on **Schedule 5.7**, there are no employment contracts as to any person employed at the Project.

**5.8** **Notice of Defaults**. To the Knowledge of Sellers, since September 30, 2009, no Seller has sent or received any notice of default or notice of termination under any of the Assigned Contracts. Sellers have made available to Purchaser prior to the execution of this Agreement true and correct copies of the Assigned Contracts or will promptly make available such copies after the execution of this Agreement.

**5.9** **Environmental Matters**. Except as disclosed in the Environmental Report, no Hazardous Substances are present in, on or about the Land or any improvements or utility facilities thereon. Except as disclosed in the Environmental Report, there have not been any claims, investigations, administrative proceedings, litigation, regulatory hearings or requests or demands for remedial or response actions or for compensation with respect to the Land, alleging noncompliance with or violation of any Environmental Law, seeking relief under any Environmental Law or relating to any permits, licenses or authorizations issued pursuant to any Environmental Law. All reports and notices required by any Environmental Law have been duly made with respect to the Land, and all permits, licenses and authorizations required by any Environmental Law for operation of the Improvements have been obtained and are in full force and effect. Except as disclosed in the Environmental Report, there is not now present, nor to the Knowledge of Sellers, has there ever been present, in, on or under the Land any above ground or underground storage tanks used for the storage of petroleum, petroleum by products or any other Hazardous Substances, other than de minimus quantities of Hazardous Substances used in the Ordinary Course of Business of a hotel/water park, all in substantial compliance with all applicable Environmental Laws. There are no wells on the Land. The Land is not and never has been listed on the United States Environmental Protection Agency's National Priorities List of Hazardous Waste Sites or to the best of Sellers' knowledge on any other list, schedule, log, inventory or record of hazardous waste sites maintained by any federal, state or local agency. Sellers have disclosed and delivered to Purchaser true and complete copies of all environmental reports, including without limitation the Environmental Report, and investigations which Sellers have obtained with respect to the Land or any part thereof or improvements located thereon, together with all drafts thereof. No Hazardous Substances were used in the construction of Improvements.

**5.10** **Title**. Subject to the entry of the Sale Order, Sellers will transfer marketable fee simple absolute title to, or in the case of any assets leased or licensed by Sellers (except for the interests of Sellers under the Ground Lease, all of which will be conveyed to Purchaser), a valid

-19-

leasehold or licensed interest in, all of the Purchased Assets, free and clear of any Lien, charge, mortgage, deed of trust, restriction or encumbrance, except Permitted Encumbrances.

**5.11** **Real Property**.

(a)     Sellers do not own or hold any interest in any real property other than the Real Property.

(b)     Sellers do not lease any real property for use in the conduct of the Business other than pursuant to the Ground Lease. With respect to the Ground Lease: (i) no party to the Ground Lease has repudiated any provision thereof; (ii) there are no disputes, oral agreements or forbearance programs in effect as to the Ground Lease; (iii) the Ground Lease have not been modified in any respect, except to the extent that such modifications are disclosed by the documents delivered to Purchaser; and (iv) Sellers have not assigned, transferred, conveyed, mortgaged, deeded in trust or encumbered any interest in the Ground Lease except pursuant to the DIP Loan Documents in favor of the DIP Lender and to the Prepetition Senior Loan Documents in favor of the Prepetition Senior Lender.

(c)     The Facility is not located in a 100 Year Flood Plain as depicted on any FIRM Maps or as determined by the Federal Emergency Management Agency.

(d)     The Facility has legal access to Nations Drive, Gurnee, Illinois, a publicly dedicated and maintained road or street.

**5.12** **Assigned Contracts**. Each of the Assigned Contracts is in full force and effect and is valid and binding obligation of each Seller party thereto and, to the Knowledge of Sellers, the other parties thereto, enforceable in accordance with its terms and conditions, in each case except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Subject to **Section 2.2** above and upon entry of the Sale Order and payment of the Cure Amounts, the Assigned Contracts shall be assumed by Sellers and assigned by Sellers to Purchaser.

**5.13** **Intellectual Property**. Sellers are the owners of or have rights to use all Intellectual Property used by Sellers in connection with the conduct of the Business, all as set forth on **Exhibit F**.

(a)     The Intellectual Property owned by Sellers is listed under "Owned Intellectual Property" on **Exhibit F** or other Intellectual Property licensed to, or used by Sellers is listed under the heading "Licensed Intellectual Property" on **Exhibit F**.

(b)     **Exhibit F** sets forth a complete and accurate list of all agreements between any Seller, on the one hand, and any Person, on the other hand, where such Seller has granted or has been granted any right to use or practice any rights under any of the Intellectual Property owned or used by Sellers in connection with the conduct of the Business (collectively, "***Intellectual Property Licenses***").

(c)     Except as disclosed on **Exhibit F**, the conduct of the Business and the exercise of rights in the Intellectual Property used in connection with the conduct of the Business do not infringe upon or otherwise violate the Intellectual Property rights of any Person.

(d)     To Knowledge of Sellers, no Person is infringing upon or otherwise violating any of the Intellectual Property owned or used by Sellers and used in connection with the conduct of the Business.

(e)     There are no pending claims or, to the Knowledge of Sellers, threatened claims, of any Persons relating to the scope, ownership or use of any of the Intellectual Property owned or used by Sellers in connection with the conduct of the Business.

(f)     Except as disclosed on **Exhibit F**, to the Knowledge of Sellers, the Purchased Assets include all material Intellectual Property required to operate the Facility and conduct the Business as currently conducted by Sellers.

**5.14    Permits; Legal Requirements**.   **Schedule 5.14** sets forth a list and brief description of each Permit held, owned or possessed by Sellers in connection with the conduct of the Business or the operation of the Facility and such Permits are the only Permits required for Sellers to conduct the Business and operate the Facility.   Sellers and the Facility are each in compliance with all applicable Legal Requirements, except whether failure to comply would not have a Material Adverse Effect.

**5.15    Litigation**.   Except for the Bankruptcy Case and as set forth on **Schedule 5.15**, neither any Seller nor any of the Purchased Assets is subject to any litigation, action, suit or proceeding by or before any court, arbitrator or federal, state or other governmental agency, commission or board, or by any private party, and, to the Knowledge of Sellers, no such litigation, action, suit or proceeding is pending or threatened and no litigation, action, suit or proceeding is pending or threatened which questions the legality or propriety of the transactions contemplated by this Agreement.

**5.16    Taxes**. Except for the Bankruptcy Case and as set forth on Schedule 5.16, Sellers have filed all federal, state and local Tax Returns required to be filed (subject to extension) and has paid or made provision for the payment of all taxes due and payable pursuant to such returns and pursuant to any assessments made against it or any of its property and all other taxes, fees and other charges imposed on it or any of its property by any governmental authority (other than taxes, fees or charges the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in accordance with GAAP have been provided on the books of Sellers).   No tax liens have been filed and no material claims are being asserted with respect to any such taxes, fees or charges.

**5.17    Records**.   All accounts, books, ledgers and official or other records of whatever kind included within the Purchased Assets have been fully, properly and accurately kept and completed in all respects and there are no inaccuracies or discrepancies of any kind contained or reflected therein.

DB02:9158739.1          068913.1001

**5.18    Employees**.  Neither Seller has any employees.  Neither Manager nor any Seller has an ERISA Plan.

**5.19    Foreign Person**.  Neither Seller is a "foreign person" as defined in Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

**5.20    WARN ACT; COBRA**.  Assuming the DIP Lender has funded all amounts owing by Purchaser to Sellers under the Approved Budget Expenses relating to employees, Sellers have paid (or will pay on or prior to Closing) all liabilities and obligations relating to any employee or any employee benefits including without limitation, liability under COBRA or the WARN Act.

**5.21    No Other Representations or Warranties**.  Except for the representations and warranties contained in this **Article V** (as modified by the Schedules hereto as supplemented or amended), neither Sellers nor any other Person makes any other express or implied representation or warranty (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or non-infringement) with respect to Sellers, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in **Article V** hereof (as modified by the Schedules hereto, as supplemented or amended), Sellers (a) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or non-infringement) and (b) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Sellers or any of their Affiliates).  Sellers make no representations or warranties to Purchaser regarding the probable success or profitability of the business or assets being acquired by Purchaser.  The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.  The Purchased Assets are being transferred to Purchaser on a **"WHERE IS"** and, as to condition, **"AS IS"** basis.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers that:

**6.1    Purchaser's Existence**.  Purchaser is a limited liability company duly organized, validly existing, and in good standing under the laws of Delaware.

**6.2    Authority**.  Purchaser has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or

DB02:9158739.1          068913.1001

certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "**Purchaser Documents**"), to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly and validly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, now or hereafter in effect, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3 <u>Conflicts; Consents of Third Parties.</u>

(a) To the Knowledge of Purchaser, none of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of formation, limited liability company agreement, and comparable organizational documents, as the case may be, of Purchaser, (ii) any Contract or permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound or (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law.

(b) Except for the Sale Order and the issuance of a replacement liquor license to Purchaser, to the Knowledge of Purchaser, no consent, waiver, approval, Order, permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to operate the Purchased Assets that has not been obtained.

6.4 <u>Financial Advisors</u>. No Person engaged by Purchaser to act, directly or indirectly, as a broker, finder or financial advisor for Purchaser or any of its Subsidiaries in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment from Sellers in respect thereof.

**6.5     Sufficient Funds**.  Purchaser has sufficient funds available to consummate this transaction.

**6.6     Condition of the Purchased Assets**.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Sellers in **Article V** hereof (as modified by the Schedules hereto, as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "**WHERE IS**" and, as to condition, "**AS IS**" basis.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Sellers set forth in **Article V** hereof (as modified by the Schedules hereto as supplemented or amended).  Purchaser further represents that neither Sellers nor any of their Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers, the Sellers' Business, the Purchased Assets or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of the Sellers, any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Sellers relating to the Purchased Assets or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Purchased Assets and the transactions contemplated hereby.  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Purchased Assets and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

**7.1     Competing Bids**.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of competing offers (each a "***Competing Bid***").  From the date hereof (and any prior time) and until the deadline contained in the Bidding Procedures Order for the submission of a Competing Bid, Sellers are permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of any or all of the Purchased Assets or any other form of Alternative Transaction.  In addition, Sellers shall be permitted in accordance with the Bidding Procedures Order to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code or other applicable Law, including, without limitation, supplying information relating to the business and the assets of Sellers to prospective purchasers.

**7.2     Purchaser Protections and Bidding Procedures.**  In consideration of Purchaser conducting its due diligence and entering into this Agreement, and subject to entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers agree the bidding procedures

-24-

(the ***Bidding Procedures***") attached as an exhibit to the Bidding Procedure Order shall
be employed with respect to the transaction contemplated by this Agreement and shall be
reflected in the Bidding Procedures Order. Purchaser acknowledges and agrees that the
Bidding Procedures may be modified or supplemented by other customary procedures not
inconsistent with the matters set forth in Bidding Procedures and the terms of this
Agreement. The sale of the Purchased Assets may be subject to competitive bidding only
as set forth in Bidding Procedures.

**7.3** **Bankruptcy Court Filings**. As promptly as practicable following the execution
of this Agreement, Sellers shall file with the Bankruptcy Court the Sale Motion seeking entry of
the Bidding Procedures Order and Sale Order. Sellers shall use commercially reasonable efforts
to obtain entry of the Bidding Procedures Order and the Sale Order in due course. Purchaser
agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in
obtaining entry of the Bidding Procedures Order and Sale Order and a finding of adequate
assurance of future performance by Purchaser, including furnishing affidavits or other documents
or information for filing with the Bankruptcy Court for the purposes, among others, of providing
necessary assurances of performance by Purchaser under this Agreement and demonstrating that
Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code; *provided,
however*, that Purchaser shall have no obligation or duty to accept any substantive modifications
to this Agreement, any related agreements, the form of Bidding Procedures Order or the form of
Sale Order which are not acceptable to Purchaser. Purchaser shall not, without the prior written
consent of Sellers, file, join in, or otherwise support in any manner whatsoever any motion or
other pleading relating to the sale of the Purchased Assets hereunder.

# ARTICLE VIII

# COVENANTS

**8.1** **Access to Information; Seller's Due Diligence Materials**.

(a) **Access to Information**. Sellers agree that, prior to the Closing Date,
Purchaser shall be entitled, through its officers, employees and representatives
(including, without limitation, its legal advisors and accountants), to make such
investigation at Purchaser's sole expense (except as provided in **Section 7.2(a)(ii)**) of the
Purchased Assets and the Assumed Liabilities as it reasonably requests and to make
extracts and copies of such books and records. Any such investigation and examination
shall be conducted during regular business hours at Purchaser's sole expense (except as
provided in **Section 7.2(a)(ii)**) upon reasonable advance notice and under reasonable
circumstances and shall be subject to restrictions under applicable Law. Sellers shall
cause the officers, employees, consultants, agents, accountants, attorneys and other
representatives of Sellers to cooperate with Purchaser and Purchaser's representatives in
connection with such investigation and examination, and Purchaser and its
representatives shall cooperate with Sellers and their representatives and shall use their
reasonable efforts to minimize any disruption to Sellers' business. Notwithstanding
anything herein to the contrary, no such investigation or examination shall be permitted
to the extent that it would require Sellers to disclose information subject to attorney-
client privilege or conflict with any confidentiality obligations to which Sellers are

bound.

(b) **Sellers' Due Diligence Materials**. Within 5 days after the Effective Date, Sellers shall deliver to Purchaser, complete and accurate copies, including in electronic format wherever available, to the extent in possession of Sellers or under the direct or indirect control of Sellers (except nothing herein shall obligate Sellers to prepare any documentation not currently in existence) of the materials set forth on **Exhibit K** (the "***Due Diligence Materials***").

**8.2**    **Conduct Pending the Auction and Closing**.  Between the Effective Date and the Auction, and thereafter until the Closing Date in the event that Purchaser is the Prevailing Bidder, Sellers shall:

(a)    Conduct their operations and maintain the Purchased Assets in the Ordinary Course of Business;

(b)    Maintain all Sellers' inventories at the same level as on the Effective Date subject to such fluctuations as may be reasonable given the level of sales activity of Sellers;

(c)    Maintain in force Sellers' existing insurance against loss relating to the Purchased Assets and otherwise comply with all insurance requirements in the DIP Loan Documents and the Prepetition Senior Loan Documents;

(d)    Not sell, lease, encumber or otherwise transfer or dispose of any Purchased Assets, or any interest therein, other than transfers and dispositions made in the Ordinary Course of Business;

(e)    Maintain compliance in all material respect, with all laws, rules and regulations of each Governmental Body that relate to the Business or the Purchased Assets;

(f)    Not increase the compensation, incentive arrangements or other benefits to any officer or employee;

(g)    Not enter into any transaction, arrangement or contract with any Person except pursuant to the Bidding Procedures Order or on an arm's-length basis in the Ordinary Course of Business consistent with past custom and practice;

(h)    Not take, or fail to take, any action which will cause any of the representations and warranties of Sellers in **Article V** to no longer be true and correct at any time from the Effective Date to the Closing Date;

(i)    Pay all Taxes, when due and payable, and file all Tax Returns when due;

(j)    Not purchase, sell, lease or dispose of any Purchased Assets except for immaterial transactions in the Ordinary Course of Business; and/or

(k)     Sellers shall give prompt notice to Purchaser of

(i)     the occurrence or non-occurrence of any event of which any Seller has Knowledge that:

(A)     would reasonably be likely to make any representation or warranty of any Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time from the Effective Date to the Closing Date, or

(B)     constitutes any Material Adverse Effect;

(ii)     any material failure of any Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

(l)     Not terminate, modify or agree to modify in any material way any of the Assigned Contracts or any of the Sellers' rights with respect to any of the Assigned Contracts without the prior written consent of Purchaser, which may be withheld or delayed in the Purchaser's sole discretion.

**8.3     Consents**.

(a)     Sellers and Purchaser shall cooperate in obtaining, at the earliest practicable date, any consents from third parties which Purchaser may request; *provided, however*, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any Legal Proceedings to obtain any such consent or approval except to the extent required by law or any court order.

(b)     Notwithstanding anything herein to the contrary, the Assigned Contracts and Purchased Assets shall only be assigned by Sellers to Purchaser pursuant to the Bankruptcy Court's Sale Order approving this Agreement and the transactions contemplated hereby.

**8.4     Regulatory Approvals.**  If necessary, Purchaser and the Sellers shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or Affiliates with each applicable Governmental Body with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within five (5) Business Days after the Effective Date, (b) comply at the earliest practicable date with any request of any Governmental Body for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing.  Purchaser shall pay the cost of all fees or other payments to any Governmental Body in connection with any such filings and/or to obtain any required authorization, consent, order or approval hereunder.  Sellers or their Affiliates shall pay their own counsel fees in connection with any such filing.  Each such party shall use reasonable best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.  Each such party shall promptly inform the other parties of any

-27-

oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Purchaser and the Sellers may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this **Section 8.4(a)** as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (the Sellers or Purchaser, as the case may be).

**8.5** **Title to Purchased Assets**. At the Closing, Sellers shall, in accordance with and subject to the Sale Order, convey to Purchaser all of Sellers' right, title and interest in and to the Purchased Assets free and clear of all Liens but subject to Permitted Encumbrances.

**8.6** **Further Assurances**. Each of the parties hereto shall use its commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

**8.7** **Confidentiality.**

Purchaser agrees that all materials obtained through due diligence with respect to the Business and Purchased Assets shall be used for evaluating the Contemplated Transactions or in connection with the DIP Lender's and Prepetition Senior Lender's enforcement of their respective rights and remedies pursuant to the Postpetition Loan Documents and the Prepetition Senior Loan Documents, as the case may be, and that such due diligence materials may be delivered to any of Purchaser's transferees (or prospective transferees) of the Business and the Purchased Assets so long as such Person has signed a confidentiality agreement similar to the confidentiality agreement required by William Blair & Company to be signed by a prospective bidder pursuant to the Bidding Procedures Order.

**8.8** **Preservation of Records**. Each of the parties hereto agrees to preserve, segregate and keep the records held by it or its Affiliates relating to the Purchased Assets, Assumed Liabilities and employees of the Sellers hired by Purchaser for a period of one (1) year from the Closing Date and shall make such records and personnel available to the other, subject to compliance with applicable Law, as may be reasonably required by such party in connection with, among other things, the Bankruptcy Case or any matters or proceedings in connection therewith, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Purchaser or any of their Affiliates or in order to enable Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers or Purchaser wish to destroy such records before or after that time, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option

and expense, to take possession of the records within ninety (90) days after the date of such notice.

     **8.9**    **Supplementation and Amendment of Schedules**. Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the entire Agreement and not just such section. From time to time prior to the Closing, Sellers shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement, _however_, that no such supplements or amendments shall change the obligations of Purchaser herein or have any effect on the satisfaction of the condition to closing set forth in **Section 9.1(a)** which shall be determined without regard to any such supplements or amendments; _provided, however_, if the Closing shall occur, then Purchaser shall be deemed to have waived any right or claim pursuant to the terms of this Agreement or otherwise, including pursuant to **Article VI** and **Article VI** hereof, with respect to any and all matters disclosed pursuant to any such supplement or amendment at or prior to the Closing.

     **8.10**    **Publicity**. Neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement; _provided_ that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

     **8.11**    **Court Order**. Sellers and Purchaser shall use commercially reasonable efforts to obtain the Sale Order. If a written objection is filed to the Sale Motion, which is an objection which would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Sellers and Purchaser shall use commercially reasonable efforts to have such objection overruled.

     **8.12**    **Adequate Assurance of Future Performance**. With respect to each Assigned Contract, Purchaser agrees to provide information that is material and relevant to the Bankruptcy Court finding that adequate assurance of future performance exists. Purchaser shall be under no obligation to provide or deliver any additional undertakings, financial or otherwise, in connection with such a finding as required under the Bankruptcy Code. Purchaser agrees that it will promptly take actions reasonably required by Sellers or ordered by the Bankruptcy Court to assist in obtaining the Bankruptcy Court's entry of an order approving this Agreement, such as furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Bankruptcy Court and making Purchaser's employees and representatives available to testify

-29-

before the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Purchaser under any Assigned Contract.

**8.13     Purchaser Covenants After Closing**.  Purchaser covenants and agrees that it shall, from and after the Closing Date (unless otherwise agreed with Sellers), upon reasonable advance notice, afford to Sellers' officers, independent public accountants, attorneys, consultants and other representatives, reasonable access during normal business hours to all books and records pertaining to the Purchased Assets and the Assumed Liabilities [with respect to the period prior to the Closing Date].  To the extent that such Purchased Assets include information management systems, the Purchaser's officers, consultants and other representatives shall provide the Sellers with access to such information management systems on a royalty-free basis solely for the purpose of enabling the Sellers to conduct an orderly wind-down of the Sellers' operations until such time as the wind-down is completed.  Sellers expressly acknowledge that nothing in this Section is intended to give rise to any contingency to Sellers' obligations to proceed with the transactions contemplated herein.

**8.14     Approval of Bidding Procedures Order**.  Sellers shall use their best efforts to cause the hearing by the Bankruptcy Court relating to the approval of the Bidding Procedures Order to occur as soon as reasonably practical after the date hereof.  Prior to the time the Bankruptcy Court enters the Bidding Procedures Order, Sellers will not enter into an agreement with any Person (other than Purchaser) in connection with any sale or other disposition related to any or all of the Purchased Assets.

**8.15     Casualty Loss**.  If between the Effective Date and the Closing Date, all or any part of the Real Property is damaged by fire or other casualty, Sellers shall immediately give Purchaser written notice of the casualty.  Except in the case of any emergency, Sellers shall not repair or replace any such damage or adjust any loss with any insurer without Purchaser's written consent, which consent Purchaser shall be entitled to withhold in its sole discretion.  Sellers shall perform all repairs and replacements of any such casualty damage before Closing that Purchaser reasonably requires so long as such repairs and replacements have been approved by the DIP Lender as an Approved Budget Expenses and are funded by an advance on the DIP Facility.  At Closing Sellers shall assign to Purchaser all of Sellers' interest in any insurance proceeds paid or payable to any Seller on account of any casualty damage, less any reasonable costs Sellers incur in repairing any casualty damage with Purchaser's written consent and less any cost incurred by Sellers in obtaining or seeking to obtain any insurance proceeds if DIP Lender permit Sellers to do so under the DIP Loan Documents.

**8.16     Eminent Domain**.  If between the Effective Date and the Closing Date all or any part of the Real Property is taken by Eminent Domain, Purchaser shall have the right to terminate this Agreement.

**8.17     Use of Name.**  From and after the Closing, Sellers shall not, and shall cause each Sellers' Affiliates not to, use or license or grant any third party the right to use any name, slogan, logo, trademark, service mark, trade name or Internet domain names which are similar or reasonably likely to cause confusion with, the name "KeyLime" or any derivation thereof or any word deceptively similar to such word, except to the extent provided on **Exhibit E**.

-30-

# ARTICLE IX

## CONDITIONS TO CLOSING

**9.1    Conditions Precedent to Obligations of Purchaser**.    The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Sellers set forth in this Agreement shall have been true and correct in all material respects as of the Effective Date and shall be true and correct at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects, on and as of such earlier date), and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(b)    each Seller shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect;

(c)    there shall not have occurred and be continuing any change or event which has a Material Adverse Effect;

(d)    the conditions set forth in **Exhibit O** shall have been satisfied; and

(e)    Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in **Section 4.2**.

**9.2    Conditions Precedent to Obligations of Sellers**.    The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Purchaser set forth in this Agreement shall have been true and correct in all material respects as of the Effective Date and shall be true and correct at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects, on and as of such earlier date), and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

DB02:9158739.1          068913.1001

(b)     Purchaser shall have performed and complied in all respects with all obligations and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in **Section 4.3**.

**9.3     Conditions Precedent to Obligations of Purchaser and Sellers**.  The respective obligations of Purchaser and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers, each in such party's sole discretion, in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(b)     the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance reasonably acceptable to Sellers and Purchaser; and

(c)     the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court, and such Sale Order shall be in full force and effect, and shall not have been modified, as of the Closing Date.

**9.4     Frustration of Closing Conditions**.  Neither Sellers nor Purchaser may rely on the failure of any condition set forth in **Sections 9.1, 9.2** or **9.3**, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

# ARTICLE X

# NO SURVIVAL

**10.1     No Survival of Representations and Warranties**.  The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder and, subject to the limitations of **Section 4.6(c)**, each party hereto shall be liable to the other after the Closing for any breach thereof (*provided*, that Sellers shall have no liability to Purchaser for any breach of any covenant to be performed prior to Closing).

**10.2     No Consequential Damages**.     Notwithstanding anything to the contrary elsewhere in this Agreement, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive Damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof.

DB02:9158739.1          068913.1001

## ARTICLE XI

## TAXES

**11.1** **Transfer Taxes**. Purchaser shall be responsible for any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("*Transfer Taxes*"). Sellers and Purchaser shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes. Sellers and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

**11.2** **Intentionally Deleted**.

**11.3** **Purchase Price Allocation**. Each of the parties hereto agrees that the Purchase Price shall be allocated as reasonably determined by Purchaser in accordance with Section 1060 of the Code.

**11.4** **Cooperation and Audits**. Purchaser and Sellers shall reasonably cooperate with each other regarding Tax matters and shall make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement.

## ARTICLE XII

## MISCELLANEOUS

**12.1** **Expenses**. Except as otherwise provided in this Agreement, including, without limitation, in **Section 3.2** hereof and except for the Sellers obligation to pay the Purchasers expenses including, without limitation, Purchaser's reasonable attorney's fees and legal expenses up to the amount set forth in the Approved Budget, each of Sellers and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**12.2** **Damages and Injunctive Relief**. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this **Section 12.2** shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

**12.3** **Submission to Jurisdiction; Consent to Service of Process.**

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be

connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in **Section 12.7** hereof; *provided*, *however*, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Illinois and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of **Section 12.7**.

**12.4     Waiver of Right to Trial by Jury**.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof or therein to the extent permitted by Law.

**12.5     Entire Agreement; Amendments and Waivers**.  This Agreement (including the schedules and exhibits hereto) represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**12.6     Governing Law**.  Except to the extent inconsistent with the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota applicable to contracts made and performed in such State without regard to conflicts of laws principles thereof.

**12.7     Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written

confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers, to:

KLCG Property, LLC
P.O. Box 7095
Madison, WI 53707 1700
Attn: _____, Authorized Director
Facsimile: _____

With a copy to:

von Briesen & Roper, s.c.
411 East Wisconsin Avenue
Suite 700
Milwaukee, Wisconsin 53202
Attn: Randall D. Crocker
Facsimile: (414) 238-6532

If to Purchaser, to:

Dougherty Funding LLC
90 South Seventh Street
Suite 4300
Minneapolis, Minnesota 55402
Attn: Gregory Bolin
Facsimile: (612) 317-2045

With a copy to:

Fabyanske, Westra, Hart & Thomson, P.A.
800 LaSalle Avenue
Suite 1900
Minneapolis, Minnesota 55402
Attn: Mark W. Westra
      Paul L. Ratelle
Facsimile: 612-359-7602

**12.8** **Severability**. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially

adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**12.9    Binding Effect; Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers or Purchaser (by operation of Law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void, except that the Purchaser may assign, in its sole discretion and without any approval from Sellers, any or all of its rights, interests and obligations hereunder to: (a) any Affiliate, (b) any Person whose equity holders are some or all of the participants in the DIP Facility and/or the Prepetition Senior Obligations, (c) any direct or indirect wholly owned subsidiary of Purchaser, and/or (c) any purchaser of the Prepetition Senior Obligations and/or the DIP Indebtedness, and upon such assignment, Purchaser shall be released and discharged from any liability hereunder. Upon any such permitted assignment, the references in this Agreement to Purchaser shall apply to any such assignee unless the context otherwise requires. In the event that a chapter 11 trustee is appointed for Sellers, or in the event that Sellers' Bankruptcy Case is converted to a case under chapter 7, or in the event there shall be an approved and confirmed plan of reorganization in Sellers' Bankruptcy Case, the rights and obligations of Sellers hereunder shall be binding upon and inure to the benefit of any duly appointed trustee appointed in Sellers' Bankruptcy Case or any successor under a confirmed chapter 11 plan of reorganization or liquidation in Sellers' Bankruptcy Case. Except as provided above, no assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.

**12.10    Non-Recourse**.    No past, present or future director, officer, employee, incorporator, member, partner, counsel or equityholder of any Seller shall have any liability for any obligations or liabilities of Sellers under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

**12.11    Counterparts**. This Agreement may be executed in as many counterparts as may be required, which counterparts may be delivered by facsimile or electronic mail, and it shall not be necessary that the signature of, or on behalf of, each party, appear on each counterpart; but it shall be sufficient that the signature of, or on behalf of, each party, or that the signatures of the persons required to bind any party, appear on one or more such counterparts. All such counterparts when taken together shall constitute a single and legally binding agreement.

**12.12    Time of the Essence; Calculation of Time Period**.    Each party hereto acknowledges and agrees that time is of the essence for each and every provision of this Agreement and that the breach of any provision hereof requiring any act to be done or step to be taken within a certain period or prior to a certain date or time shall be deemed a material breach

of this Agreement.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

**12.13** **United States Dollars**.  Any reference in this Agreement to "$" shall mean U.S. dollars.

**12.14** **Exhibits/Schedules**.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

**12.15** **Gender and Number**.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

**12.16** **Headings**.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any Section are to the corresponding Section of this Agreement unless otherwise specified.

**12.17** **Certain Terminology**.  The words "herein," "hereinafter," "hereof" and "hereunder" and words to similar effect refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

**12.18** **Negotiations**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

*[Remainder Of This Page Intentionally Left Blank]*
*[Signature Page To Follow]*

DB02:9158739.1          068913.1001

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

KLCG PROPERTY, LLC, a Delaware limited liability company

By: KeyLime Cove of Gurnee, LLC
Its: Manager

By: KeyLime Cove Resorts, LLC
Its: Manager

By: _____
Name: _____
Title:  Authorized Director of

GURNEE PROPERTY, LLC

By: Keylime Cove Resorts, LLC
Its: Manager

By: _____
Name: _____
Title:  Authorized Director

DOUGHERTY FUNDING LLC

By:_____
Name:_____
Title:_____

# EXHIBITS TO ASSET PURCHASE AGREEMENT

The following are the exhibits to that Asset Purchase Agreement dated as of January 19, 2010 (the "Purchase Agreement"), by and among DOUGHERTY FUNDING LLC, a Delaware limited liability company ("**Purchaser**") and KLCG PROPERTY, LLC, a Delaware limited liability company ("**KLCG Property**"), and GURNEE PROPERTY, LLC, an Illinois limited liability company ("**Gurnee Property**"; collectively, "**Sellers**"). Each capitalized term used herein shall have the meaning assigned to it in the Agreement unless otherwise defined herein.

| Exhibit | Title |
|---------|-------|
| A | Purchased Assets |
| B-1 | Legal Description of the Land |
| B-2 | Permitted Encumbrances |
| C | Assigned Contracts |
| D | Excluded Assets |
| E | Licensed Assets |
| F | Intellectual Property |
| G | Knowledge Parties |
| H | Deed |
| I | Bill of Sale |
| J | Assignment and Assumption Agreement |
| K | Due Diligence Materials |
| L | Bidding Procedures Order with attached Bidding Procedures |
| M | Closing Conditions |
| N | Sale Order |
| O | Financial Advisors |
| P | Inventory of Personal Property |

# EXHIBIT A

## Purchased Assets

All of the assets, properties, rights and interests of each Seller of every kind and character and wherever located related to the Premises, except for the Excluded Assets (collectively, the "**Purchased Assets**"), including, without limitation, all of each Seller's right, title and interest in and to the following:

(a)    <u>Real Property</u>.

All Real Property (including, without limitation, the Land, the Facility and Sellers' interest in the Ground Lease).

(b)    <u>Inventory</u>.

All Inventory.

(c)    <u>Accounts Receivable</u>.

All Accounts Receivable.

(d)    <u>Equipment and Fixtures</u>.

All Equipment and Fixtures.

(e)    <u>General Intangibles</u>.

All General Intangibles including, without limitation:

    (i)    all Assigned Contracts;

    (ii)    all Intellectual Property and the goodwill associated with the Business;

    (iii)    all room, restaurant and other reservations; all prepaid room, restaurant and other charges held by any Seller; all security deposits and other deposits held by any Seller; and all rebates and refunds accruing to the benefit of any Seller; all reservation systems software and hotel accounting software;

    (iv)    all prepaid expenses, rent and utility deposits and deferred charges owed for use in connection with, or relating to the Premises including, without limitation, prepaid insurance premiums;

(v) all Permits, to the extent transferable or assignable, including, without limitation, the Permits enumerated on **Schedule 5.14**;

(vi) all plans and specifications, surveys, environmental reports, asbestos reports, soil reports, property condition reports, ADA reports, engineering reports and traffic reports or studies, relating to the Premises.

(vii) All claims, rights and causes of action related to the Purchased Assets, whether now existing or hereafter arising, whether arising pursuant to contract, at law or in equity, and/or whether assertable in judicial proceedings or arbitration proceedings (collectively, the "***Claims***") including, without limitation, the Commercial Tort Claims and other Claims asserted or assertable in the litigation proceedings or arbitration proceedings enumerated on **Exhibit A-1**, *provided,* that at any time and from time to time from the date hereof through the date that is one (1) Business Day prior to the Closing Date, Purchaser shall have the right by written notice to Sellers to remove any Claim and add any additional Claim. Any Claim removed shall no longer be a Claim for the purposes of this Agreement;

(viii) all rights under or pursuant to all warranties, representations and guarantees relating to any of the Purchased Assets made by suppliers, manufacturers, contractors or other third parties;

(ix) all brochures, flyers, marketing materials and other advertising materials of any sort whatsoever, including, without limitation, all print, video or electronics format thereof, used or prepared in connection with the Premises;

(ix) all interests of Sellers in any website and the software required to maintain such website used in connection with the Premises; and

(x) all telephone, telephone facsimile numbers, email addresses, domain names, internet uniform resource locators and other directory listings relating to the Business or the Facility.

(f) Books and Records.

All books and records relating to the Business or the Facility, including, without limitation, the books of account, tax, general, financial, accounting and personnel records, files, invoices, customer (current and prospective) and supplier lists, business plans, marketing studies and other written information.

(g)     Avoidance Claims.

All claims and causes of action under Chapter 5 of the Bankruptcy Code (the "***Avoidance Claims***").

(i)     Insurance.

 All proceeds of insurance payable in the event any asset which would have been a Purchased Asset has been damaged or destroyed by fire or other cause prior to the Closing Date or prior to the delivery of any such asset hereunder to Purchaser.

(j)     Cash and Cash Equivalents.

All cash and cash equivalents, including cash on hand or in bank accounts, certificates of deposit, commercial paper and securities owned by any Seller except for amounts necessary to pay: (i) Approved Budget Expenses (other than the Carve-Out) that remain to be paid on or after the Closing Date; (ii) the Carve-Out but only to the extent not previously paid from an advance on the DIP Loan Agreement; and (iii) any retainer described in the Final Order.

(k)     Other.

All other assets of Sellers that relate to or are used or useful in the conduct of the Business or the operation of the Premises including, without limitation, all DIP Facility Collateral other than Excluded Assets.

# EXHIBIT A-1

Specified Included Claims

# EXHIBIT B-1

## Legal Description of the Land

The land referred to is situated in the State of Illinois, County of Lake and is described as follows:

LOT 1 IN KEYLIME COVE SUBDIVISION BEING A RESUBDIVISION OF LOTS 1 AND 6 IN CYPRESS/GURNEE I, LTD./AUTONATION SUBDIVISION, BEING A SUBDIVISION OF PART OF THE NORTHEAST QUARTER OF SECTION 16 AND PART OF THE NORTHWEST QUARTER OF SECTION 15, ALL IN TOWNSHIP 45 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 6, 2006 AS DOCUMENT 6102586, IN LAKE COUNTY, ILLINOIS.

**Permitted Encumbrances**

1. Real estate taxes and special assessments not yet due and payable.

2. Ordinance and charges which may arise for tapping into a sanitary sewer system, recorded April 14, 1969 as Document No. 1417469.

3. Ordinance relating to connection fees for water and sewer service, recorded December 15, 1987 as Document No. 2640537.

4. Ordinance 97-70 authorizing the execution of a PUD Agreement, Granting a Special Use Permit and Approving a preliminary PUD Plat, recorded August 11, 1997 as Document No. 4004219.

5. Planned Unit Development Agreement recorded August 11, 1997 as Document No. 4004220. Certificate and Reestablished in Document recorded September 3, 1997 as Document No 4014546. First Amendment of PUD recorded December 27, 2004 as Document No. 5706225. Fourth Amendment to Planned Unit Development Agreement, approved by the Village of Gurnee on November 7, 2005, as disclosed by certificate recorded December 14, 2005 as Document No. 5914173. Assignment and Assumption of Planned Unit Development Agreement, recorded January 30, 2007 as Document No. 6129168. Assignment of Village Documents recorded February 6, 2007 as Document No. 6132353.

6. Master Declaration of Covenants, Restrictions and Development Standards, recorded August 8, 1997 as Document No. 4004221 and rerecorded November 7, 1997 as Document No. 4044727. First Amendment recorded April 2, 1998 as Document No. 4111092. Second Amendment recorded July 30, 1998 as Document No. 4177454.

7. Sign Easement Agreement recorded January 8, 1999 as Document No. 4271690.

8. Sign Use Agreement recorded January 8, 1999 as Document No. 4271691.

9. Ordinance authorizing the Village to attest to a Hotel Revenue Tax Sharing Agreement, recorded January 24, 2005 as Document No. 5723195. Assignment and Assumption of Revenue Agreement recorded January 31, 2007 as Document No. 6129626. Notice of Assignment of Revenue Sharing Agreement recorded January 31, 2007 as Document No. 6129627.

10. Easements reserved upon and granted by plat of subdivision recorded as Document No. 4186836, along with restrictions thereon set forth, except as vacated by that certain plat of resubdivision recorded as Document No. 6102586; easements reserved upon and granted by plat of resubdivision recorded as Document No. 6102586, along with Public Utility Easement Provisions thereon set forth, except the 10' public utility and drainage

easement, 10' parking setback, and 30' building line along the South line of Lot 1 and North line of Lot 6 in Cypress/Gurnee I, Ltd./Autonation Subdivision Document No. 4186836 were vacated pursuant to KEYLIME COVE RESUBDIVISION Document No. 6102586.

11. 20-foot wide sanitary sewer and water main easement, recorded in Document No. 3151239.

12. Assignment of Management Agreement, recorded January 29, 2007 as Document No. 6128095.

13. Grant of Easement to Nicor Gas recorded September 27, 2007, as Document No. 6247653.

14. Grant of Easement to Comcast of Illinois XII, LP recorded December 19, 2007, as Document No. 6283059.

# EXHIBIT C

## Assigned Contracts

1.  All rights of KLCG Property pursuant to that Trademark License Agreement dated as of December 29, 2006, between KeyLime Cove Resorts, LLC, a Delaware limited liability company, as licensor, and KLCG Property, as licensee.

2.  All rights of KLCG Property pursuant to that License Agreement dated December 29, 2006, between DWA Holdings, LLC, a Minnesota limited liability company, as licensor and KLCG Property, as licensee, respecting the restaurant concept known as "Crazy Toucan's Margarita Hut™".

3.  All rights of KLCG Property pursuant to that License Agreement dated December 29, 2006, between DWA Holdings, LLC, a Minnesota limited liability company, as licensor and KLCG Property, as licensee, respecting the restaurant concept known as "DW Anderson's Old Fashioned Ice Cream Parlor and Eatery™".

4.  All rights of KLCG Property pursuant to that certain Planned Unit Development Agreement dated June 16, 1997 filed for record in Lake County, Illinois on September 3, 1997 as Document No. 4014546 as amended by First Amendment to Planning Unit Development Agreement dated December 20, 2004, filed for record December 27, 2004 as Document No. 5706225, Second Amendment to Planning Unit Development Agreement dated March 21, 2005, Third Amendment to Planning Unit Development Agreement dated May 2, 2005, Fourth Amendment to Planning Unit Development Agreement dated November 7, 2005, filed for record December 14, 2005 as Document No. 5914173 and Assignment and Assumption of Planned Unit Development Agreement dated December 22, 2006 filed for record January 30, 2007 as Document No. 6129168.

5.  All rights of KLCG pursuant to that certain Hotel Tax Revenue Sharing Agreement dated December 20, 2004, filed for record in Lake County, Illinois on January 24, 2005 as Document No. 5723195, as amended by First Amendment to Hotel Tax Revenue Sharing Agreement dated March 21, 2005, Second Amendment to Hotel Tax Revenue Sharing Agreement dated May 2, 2005, Assignment and Assumption of Revenue Agreement dated December 22, 2006, filed for record January 31, 2007 as Document No. 6129626, and Notice of Assignment of Revenue Sharing Agreement dated December 22, 2006, filed for record January 31, 2007 as Document No. 6129627.

## Other Contracts

1.  Agreement dated August 8, 2007 between Namco Cybertainment, Inc. and KLCG Property with respect to the provision of certain amusement devices at the Premises.

2.  Hotel Management Agreement between S&L Hospitality, LLC, as manager, and KLCG Property, as owner, dated September 15, 2008.

3.  Six Flags Agreement [need copy].

4.  Copier Lease with Great America Leasing Corporation [need copy].

5.  All other service, utility, maintenance, management and other contracts and agreements affecting the operation and maintenance of the Facility.

# EXHIBIT D

## Excluded Assets

Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall not include and the following assets shall not be conveyed hereunder (collectively, the "**Excluded Assets**"):

(a)     Any Contract that is not an Assigned Contract;

(b)     Sellers' rights, claims or causes of action in connection with this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof;

(c)     Cash and cash equivalents, including cash on hand or in bank accounts, certificates of deposit, commercial paper and securities owned by any Seller necessary to pay (i) Approved Budget Expenses (other than the Carve-Out) that remain to be paid on or after the Closing Date; (ii) the Carve-Out but only to the extent not previously paid by an advance on the DIP Loan Agreement; and (iii) any retainer described in the Final Order;

(d)     Any retainer described in the Final Order; and

(e)     Any assets of Manager.

Purchaser retains the right to designate other assets as Excluded Assets based on its due diligence, *provided, however,* that such designation does not reduce the Purchase Price.

## EXHIBIT E

### Licensed Assets

1.  All Intellectual Property licensed to KLCG Property pursuant to that Trademark License Agreement dated as of December 29, 2006, between KeyLime Cove Resorts, LLC, a Delaware limited liability company, as licensor, and KLCG Property, as licensee.

2.  All Intellectual Property licensed to KLCG Property pursuant to that License Agreement dated December 29, 2006, between DWA Holdings, LLC, a Minnesota limited liability company, as licensor and KLCG Property, as licensee, respecting the restaurant concept known as "Crazy Toucan's Margarita Hut™".

3.  All Intellectual Property licensed to KLCG Property pursuant to that License Agreement dated December 29, 2006, between DWA Holdings, LLC, a Minnesota limited liability company, as licensor and KLCG Property, as licensee, respecting the restaurant concept known as "DW Anderson's Old Fashioned Ice Cream Parlor and Eatery™".

**EXHIBIT F**

**Intellectual Property**

**Owned Intellectual Property:**

Other than the Licensed Intellectual Property listed below, all Intellectual Property used or useful in connection with the Facility or the Business.

**Licensed Intellectual Property**

1.      The Intellectual Property licensed to KLCG Property pursuant to the licenses described on <u>Exhibit E</u>

# EXHIBIT G

## Knowledge Parties

Steven Nerger
Russell Archuletta
Dale McFarland
Mac Rao
Thomas R. Pientka
David W. Anderson

<u>Purchaser Knowledge Parties</u>

Gregory Bolin
Jerome Tabolich

# EXHIBIT H

## Deed

<table>
<tr>
<td>

THIS INSTRUMENT PREPARED BY:

_____

_____

_____

AFTER RECORDING THIS DOCUMENT
SHOULD BE RETURNED TO:

_____

_____

_____

</td>
<td>

<br><br><br><br><br><br><br><br><br><br><br>

The above space for recorder's use only

</td>
</tr>
</table>

## QUIT CLAIM DEED

**THIS INDENTURE** is made as of the _____ day of _____, 20___ by and between
_____, a _____, party of the first part
("Grantor"), whose address is _____, and
_____, a _____, party of the second part
("Grantee"), whose address is _____.

WITNESSETH, that Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) in hand paid by Grantee, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, by these presents does hereby CONVEY AND QUIT CLAIM unto Grantee all interest and title of Grantor in the real property situated in the County of Lake, State of Illinois, legally described as follows, to wit:

**See Exhibit A attached hereto and made a part hereof**

Property Address:    _____

P.I.N.:    _____

TOGETHER WITH all of Grantor's right, title and interest in the improvements, hereditaments, easements and appurtenances thereunto belonging, or in anyway appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, either in law or equity, of, in and to the above described premises, with the improvements, hereditaments, easements and appurtenances thereunto belonging.

**IN WITNESS WHEREOF,** Grantor has executed this Quit Claim Deed as of the day and date first above written.

_____

By: _____
Name: _____
Title: _____

ATTEST:

By: _____
Name: _____
Title: _____

STATE OF _____ )
                         )    SS
COUNTY OF _____ )

     I, the undersigned, a Notary Public in and for the County and State aforesaid, DO HEREBY CERTIFY, that the above named _____ and _____, as _____ and _____, respectively, of _____, the grantor under the foregoing instrument, personally known or identified to me to be the same persons whose names are subscribed to the foregoing instrument as such _____ and _____, respectively, appeared before me this day in person and acknowledged that they signed and delivered the said instrument as their free and voluntary act, and the free and voluntary act of such _____, and pursuant to proper authority granted therefor, for the uses and purposes therein set forth.

     GIVEN under my hand and notarial seal this _____ day of _____, 20___.

By: _____     [SEAL]
     Notary Public
Commission Expires: _____

## EXHIBIT A

### Legal Description

The land referred to is situated in the State of Illinois, County of Lake and is described as follows:

LOT 1 IN KEYLIME COVE SUBDIVISION BEING A RESUBDIVISION OF LOTS 1 AND 6 IN CYPRESS/GURNEE I, LTD./AUTONATION SUBDIVISION, BEING A SUBDIVISION OF PART OF THE NORTHEAST QUARTER OF SECTION 16 AND PART OF THE NORTHWEST QUARTER OF SECTION 15, ALL IN TOWNSHIP 45 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED DECEMBER 6, 2006 AS DOCUMENT 6102586, IN LAKE COUNTY, ILLINOIS.

# EXHIBIT I

## Bill of Sale

Bill of Sale dated as of _____, 2010, from KLCG Property, LLC, a Delaware limited liability company and Gurnee Property, LLC, an Illinois limited liability company (each a "Seller" and collectively the "Sellers") and [_____], a Delaware limited liability company ("Purchaser").

## RECITALS

A.      On December 16, 2009, Sellers respectively filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") being jointly administered in the case captioned *In re KLCG Property, LLC and Gurnee Property, LLC* (Case No. 09-14418 (KJC)).

B.      This Bill of Sale is being executed and delivered in connection with the consummation of the sale and purchase transaction contemplated in that certain Asset Purchase Agreement between Purchaser, [as the assignee of Dougherty Funding LLC], and Seller, dated January 19, 2010 (herein after called the "Purchase Agreement"). Capitalized terms used but not otherwise defined in this Bill of Sale have the respective meanings set forth in the Purchase Agreement, the applicable terms of which are hereby incorporated by reference into this Bill of Sale.

C.      On March __, 2010, the Bankruptcy Court entered an Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtor Outside the Ordinary Course of Business Free and Clear of All Liens, Claims, Interests and Encumbrances; (B) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (the "Sale Order").

D.      Pursuant to <u>Section 2.1</u> of the Purchase Agreement, Sellers have agreed to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser has agreed to purchase and accept, all of Sellers' respective right, title and interest in and to the Purchased Assets.

E.      Pursuant to the Purchase Agreement, Sellers have agreed to execute and deliver this Bill of Sale with respect to the Purchased Assets to be conveyed by Sellers to Purchaser at the Closing.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, upon the terms and subject to the conditions set forth in the Purchase Agreement and the Sale Order, Sellers do hereby irrevocably and unconditionally sell, transfer, convey, assign and deliver to Purchaser all of Sellers' right, title and interest in and to the Purchased Assets, free and clear of all liens, claims, interests, and other encumbrances within the meaning of Section 363(f) of the Bankruptcy Code except for Permitted Encumbrances;

<u>provided</u> that Sellers are not selling, transferring, conveying, assigning or delivering any Excluded Assets.

TO HAVE AND TO HOLD the same unto Purchaser and its successors and assigns, to and for its or their use, forever, subject, however, to all terms, conditions and provisions in the Purchase Agreement and the Sale Order.

Except as provided in the Purchase Agreement or the Sale Order, the Purchased Assets are sold and conveyed "as is", "where is", and with all faults and defects, and Sellers make no warranty, express or implied, as to condition, description, fitness for a particular purpose, merchantability, or as to any other matter.

By its execution hereof, Purchaser hereby accepts the foregoing sale, transfer, conveyance, assignment and delivery.

Sellers hereby covenant and agree that they shall, at any time or from time to time hereafter at the reasonable request of Purchaser and at the sole cost and expense of Purchaser, execute and deliver such further instruments of conveyance, sale, transfer and assignment to Purchaser for any of the Purchased Assets.

Each Seller hereby constitutes and appoints Purchaser and its successors and assigns as such Seller's true and lawful attorneys in fact in connection with the transactions contemplated by this instrument, with full power of substitution, in the name and stead of such Seller but on behalf of and for the benefit of Purchaser and its successors and assigns, to demand and receive any and all of the Purchased Assets hereby conveyed, assigned, and transferred or intended so to be, and to give receipt and releases for and in respect of the same and any part thereof, and from time to time to institute and prosecute, in the name of such Seller or otherwise, for the benefit of Purchaser or its successors and assigns, proceedings at law, in equity, or otherwise, which Purchaser or its successors or assigns reasonably deem proper in order to collect or reduce to possession or endorse any of the Purchased Assets and to do all acts and things in relation to the Purchased Assets which Purchaser or its successors or assigns reasonably deem desirable.

The terms and provisions of this Bill of Sale shall be binding upon each Seller and its successors and assigns, and shall inure to the benefit of Purchaser and its successors and assigns.

Nothing in this Bill of Sale is intended to or shall confer upon any Person other than the parties, and their respective successors and assigns, any rights, benefits, or remedies of any nature whatsoever under or by reason of this Bill of Sale or any transaction contemplated by this Bill of Sale.

This Bill of Sale shall be governed by and construed and enforced in accordance with (i) the laws of the State of Minnesota, without regard to its conflict of laws, rules or principles and (ii) the Bankruptcy Code, to the extent applicable.

To the extent any term or provision herein is inconsistent with the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control. To the extent that any term or

provision herein or in the Purchase Agreement is inconsistent with the Sale Order, the Sale Order shall control.

This Bill of Sale may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be duly executed and delivered as of the date first set forth above.

**SELLER:**

**KLCG PROPERTY, LLC**, a Delaware limited liability company

By: KeyLime Cove of Gurnee, LLC
Its: Manager

    By: KeyLime Cove Resorts, LLC
    Its: Manager

        By: _____
        Name: _____
        Title: Authorized Director

**GURNEE PROPERTY, LLC**

By: Keylime Cove Resorts, LLC
Its: Manager

    By: _____
    Name: _____
    Title: Authorized Director

**PURCHASER:**

[_____]

By:_____
Name:_____
Title:_____

## Assignment and Assumption Agreement

ASSIGNMENT AND ASSUMPTION AGREEMENT dated as of _____, 2010, from KLCG Property, LLC, a Delaware limited liability company and Gurnee Property, LLC, an Illinois limited liability company (each an "Assignor" and collectively the "Assignors") and [_____], a Delaware limited liability company ("Purchaser").

## RECITALS

A.     On December 16, 2009, Assignors respectively filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), being jointly administered in the case captioned *In re KLCG Property, LLC and Gurnee Property, LLC* (Case No. 09-14418 (KJC)).

B.     This Assignment and Assumption Agreement is being executed and delivered in connection with the consummation of the sale and purchase transaction contemplated in that certain Asset Purchase Agreement between Purchaser, as the assignee of Dougherty Funding LLC, and Assignors, dated January 19, 2010 (herein after called the "Purchase Agreement"). Capitalized terms used but not otherwise defined in this Assignment and Assumption Agreement have the respective meanings set forth in the Purchase Agreement, the applicable terms of which are hereby incorporated by reference into this Assignment and Assumption Agreement.

C.     On March __, 2010, the Bankruptcy Court entered an Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtor Outside the Ordinary Course of Business Free and Clear of All Liens, Claims, Interests and Encumbrances; (B) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (C) Granting Related Relief (the "Sale Order").

D.     Pursuant to <u>Section 2.1</u> of the Purchase Agreement, Assignor has agreed to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser has agreed to purchase and accept, all of Assignor's respective right, title and interest in and to the Purchased Assets, including without limitation the Assigned Contracts.

E.     Pursuant to <u>Section 2.3</u> of the Purchase Agreement, Purchaser has agreed to assume the Assumed Liabilities.

F.     The parties hereto acknowledge that pursuant to that certain Bill of Sale of even date herewith, Assignors irrevocably and unconditionally sold, transferred, conveyed, assigned and delivered to Assignee all of Assignors' right, title and interest in and to the Purchased Assets, which include the Assigned Contracts.

G.     Pursuant to the Purchase Agreement and subject to the Bidding Procedures Order and the Sale Order, the parties have agreed to execute this Assignment and Assumption

Agreement with respect to the Assigned Contracts to be conveyed by Assignors to Purchaser at the Closing and with respect to Purchaser's assumption of the Assumed Liabilities.

NOW THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Assignor and Purchaser hereby agree as follows:

1. Upon the terms and subject to the conditions set forth in the Purchase Agreement, Assignor hereby sells, transfers, conveys, assigns and delivers to Purchaser all of Assignor's right, title and interest in and to the Assigned Contracts set forth on Exhibit A attached hereto and incorporated herein by reference, free and clear of all liens, claims, interests, and other encumbrances within the meaning of Section 363(f) of the Bankruptcy Code, except for Permitted Encumbrances. Notwithstanding the foregoing, nothing in this Assignment and Assumption Agreement is intended, or shall be construed, to result in the sale, transfer, conveyance, assignment or delivery of any Excluded Assets.

2. Upon the terms and subject to the conditions set forth in the Purchase Agreement, the Bidding Procedures Order and the Sale Order and in accordance with Section 365(k) of the Bankruptcy Code, Purchaser hereby acknowledges and accepts such sale, transfer, conveyance, assignment and delivery of such Assigned Contracts and hereby assumes and agrees to pay, satisfy and discharge when due, the Assumed Liabilities as set forth in Section 2.3 of the Purchase Agreement. Notwithstanding the foregoing, Purchaser shall not assume or be obligated to pay, satisfy, discharge or perform, and shall not be deemed by virtue of the execution and delivery of this Assignment and Assumption Agreement, or as a result of the consummation of the transactions contemplated by this Assignment and Assumption Agreement, to have assumed, or to have agreed to pay, satisfy, discharge or perform Excluded Liabilities or any other liabilities or obligations of Assignor other than the aforementioned Assumed Liabilities.

3. If any provision of this Assignment and Assumption Agreement is held to be illegal, invalid, or unenforceable under any present or future law, and if the rights or obligations under this Assignment and Assumption Agreement of Assignors, on the one hand, and Assignee on the other hand will not be materially adversely affected thereby, (a) such provision shall be fully severable; (b) this Assignment and Assumption Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Assignment and Assumption Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Assignment and Assumption Agreement; and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Assignment and Assumption Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

4. The assumption by Assignee of the Assumed Liabilities as provided herein shall not be construed to defeat, impair or limit in any way any rights of Assignors or Assignee to dispute the validity or amount thereof.

5.    The terms and provisions of this Assignment and Assumption Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.    This Assignment and Assumption Agreement may not be amended or modified except by an instrument in writing signed by Purchaser and Assignors, and no performance, term or condition can be waived in whole or in part except by a writing signed by the party against whom enforcement of the waiver is sought.

7.    Nothing in this Assignment and Assumption Agreement is intended to or shall confer upon any Person other than Purchaser and Assignors, and their respective successors and assigns, any rights, benefits, or remedies of any nature whatsoever under or by reason of this Assignment and Assumption Agreement or any transaction contemplated by this Assignment and Assumption Agreement.

8.    To the extent any term or provision herein is inconsistent with the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control.  To the extent that any term or provision herein or in the Purchase Agreement is inconsistent with the Sale Order, the Sale Order shall control.

9.    This Assignment and Assumption Agreement shall be governed by and construed and enforced in accordance with (a) the laws of the State of Minnesota, without regard to its conflict of laws, rules, or principles and (b) the Bankruptcy Code, to the extent applicable. Without limiting any party's right to appeal any order of the Bankruptcy Court, (x) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Assignment and Assumption Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Assignment and Assumption Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (y) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.7 of the Purchase Agreement; *provided, however,* that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute.  Each party irrevocably consents to and confers personal jurisdiction on the courts referred to above, and irrevocably and unconditionally waives any objection to the venue of such courts, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any lawsuit, action or other proceeding brought in any such court has been brought in an inconvenience forum.  Each party hereto further agrees that service of process may be made on such party by mailing a copy of the pleading or other document by registered or certified mail, return receipt requested, to its addresses for the giving of notice provided for in Section 12.7 of the Purchase Agreement, with service being deemed to be made five (5) Business Days after the giving of such notice.    PURCHASER AND ASSIGNORS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT

OF, UNDER OR IN CONNECTION WITH THIS ASSIGNMENT AND ASSUMPTION AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10. This Assignment and Assumption Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

11. Except as otherwise herein provided, all expenses incurred in connection with this Assignment and Assumption Agreement or the transactions herein provided for shall be paid by the party incurring such expenses and costs

12. This Assignment and Assumption Agreement has been cooperatively and mutually drafted and will not be construed or interpreted more strictly against either party.

13. Each of the parties hereto covenants and agrees, at the Purchaser's expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Assignment and Assumption Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be duly executed and delivered as of the date first written above.

**KLCG PROPERTY, LLC**, a Delaware limited liability company

By: KeyLime Cove of Gurnee, LLC
Its: Manager

    By: KeyLime Cove Resorts, LLC
    Its: Manager

        By: _____
        Name: _____
        Title: Authorized Director

**GURNEE PROPERTY, LLC**

By: Keylime Cove Resorts, LLC
Its: Manager

    By: _____
    Name: _____
    Title: Authorized Director

    [_____]

By: _____
Name: _____
Title: _____

# EXHIBIT A

## ASSIGNED CONTRACTS

1. Trademark License Agreement dated as of December 29, 2006, between KeyLime Cove Resorts, LLC, a Delaware limited liability company, as licensor, and KLCG Property, as licensee.

2. License Agreement dated December 29, 2006, between DWA Holdings, LLC, a Minnesota limited liability company, as licensor, and KLCG Property, as licensee, respecting the restaurant concept known as "Crazy Toucan's Margarita Hut™".

3. License Agreement dated December 29, 2006, between DWA Holdings, LLC, a Minnesota limited liability company, as licensor, and KLCG Property, as licensee, respecting the restaurant concept known as "DW Anderson's Old Fashioned Ice Cream Parlor and Eatery™".

4. Planned Unit Development Agreement dated June 16, 1997 filed for record in Lake County, Illinois on September 3, 1997 as Document No. 4014546 as amended by First Amendment to Planning Unit Development Agreement dated December 20, 2004, filed for record December 27, 2004 as Document No. 5706225, Second Amendment to Planning Unit Development Agreement dated March 21, 2005, Third Amendment to Planning Unit Development Agreement dated May 2, 2005, Fourth Amendment to Planning Unit Development Agreement dated November 7, 2005, filed for record December 14, 2005 as Document No. 5914173 and Assignment and Assumption of Planned Unit Development Agreement dated December 22, 2006 filed for record January 30, 2007 as Document No. 6129168.

5. Hotel Tax Revenue Sharing Agreement dated December 20, 2004, filed for record in Lake County, Illinois on January 24, 2005 as Document No. 5723195, as amended by First Amendment to Hotel Tax Revenue Sharing Agreement dated March 21, 2005, Second Amendment to Hotel Tax Revenue Sharing Agreement dated May 2, 2005, Assignment and Assumption of Revenue Agreement dated December 22, 2006, filed for record January 31, 2007 as Document No. 6129626, and Notice of Assignment of Revenue Sharing Agreement dated December 22, 2006, filed for record January 31, 2007 as Document No. 6129627.

## [Other Contracts—TBD]

1. Agreement dated August 8, 2007 between Namco Cybertainment, Inc. and KLCG Property with respect to the provision of certain amusement devices at the Premises.

2. Hotel Management Agreement between S&L Hospitality, LLC, as manager, and KLCG Property, as owner, dated September 15, 2008.

3. Six Flags Agreement [need copy].

4.    Copier Lease with Great America Leasing Corporation [need copy].

5.    All other service, utility, maintenance, management and other contracts and agreements affecting the operation and maintenance of the Facility.

# EXHIBIT K

## Due Diligence Materials

Pursuant to **Section 8.1(b)**, Sellers shall provide the following materials to Purchaser, to the extent in any Seller's possession or control:

1.  All contracts, agreements, leases, and other agreements that affect the ownership, management, maintenance or operation of the Purchased Assets.

2.  All warranties and guarantees given to, assigned to or benefiting Sellers or the Real Property or any other Purchased Asset regarding the construction, design, use, operation, management or maintenance of such Purchased Asset.

3.  All Permits, including, without limitation, certificates of occupancy or of substantial completion issued with respect to the construction and ownership of the Real Property, including the liquor licenses for the Facility.

4.  Real estate tax statements for real estate taxes and installments of special assessments due and payable in the calendar year of Closing with respect to the Premises and, if received by Sellers, the valuation notice issued with respect to the Premises for the real estate taxes payable in the calendar year following the calendar year of Closing.

5.  All plans and specifications with respect to the Real Property.

6.  All environmental reports (other than the Environmental Report), asbestos reports, soil reports, property condition reports, ADA reports, engineering reports, and traffic reports or studies, relating to the Premises, including all drafts and letters and other documents that order, describe, or limit the scope of such tests, reports, or studies.

7.  All Equipment manuals relating to the Real Property.

8.  Sellers' current title insurance policies.

9.  The most recent survey of the Real Property.

10. Current insurance policies on the Facility.

11. All other records regarding real estate taxes and assessments, insurance, maintenance, repairs, and/or capital improvements.

12. Current operating statements of the Premises and cash flow projections for the Premises for the period ending _____.

13.   Any other information Purchaser reasonably requests with respect to the Purchased Assets.

# EXHIBIT L

## Bidding Procedures Order

## [SEE ATTACHED]

# EXHIBIT M

## Closing Conditions

1.   At Purchaser's cost, Purchaser shall have received a title insurance policy issued on the Closing Date by a title insurance company selected by Purchaser, which policy shall be an ALTA Owner's Policy of Title Insurance insuring marketable fee simple title of Purchaser in and to the Real Property, in the amount of the Purchase Price, together with endorsements reasonably requested by Purchaser, subject only to the Permitted Encumbrances and free and clear of all standard or general exceptions.

2.   At Purchaser's cost, Purchaser shall have received a Phase I Environmental Site Assessment or an update to the Environmental Report, provided by a reputable environmental consultant selected by Purchaser, in accordance with ASTM Practice E1527-05, which report shall be in form and substance acceptable to Purchaser in its sole discretion.

3.   At Purchaser's cost, Purchaser shall have obtained a liquor license to operate the liquor facilities in the Premises from the City of Gurnee.

4.   Sellers shall deliver exclusive legal and actual possession and control of the Real Property and all Personal Property to Purchaser on the Closing Date, subject only to the Permitted Encumbrances, in a physical condition that is equal to or better than the physical condition of the Real Property on the Effective Date, subject only to reasonable wear and tear, and broom-clean with substantially all garbage and personal property removed from the Real Property other than Personal Property that constitutes Purchased Assets.

5.   Any consents of third parties to the transfers contemplated hereby shall have been received by Purchaser and shall be in full force and effect.

6.   The Premises shall be in material compliance with all laws, rules, regulations and ordinances of applicable Governmental Bodies.

7.   There shall be no adverse or other parties in possession of the Premises or any part thereof, except Sellers and overnight hotel guests.

8.   Consent of the Licensors to the transfer of the respective licenses described on **Exhibit E** to Purchaser.

# EXHIBIT N

## Sale Order

## [SEE ATTACHED]

**EXHIBIT O**

**Financial Advisors**

William Blair & Company

**EXHIBIT P**

**Inventory of Personal Property**

[TO BE PROVIDED BY SELLERS]

## SCHEDULES TO ASSET PURCHASE AGREEMENT

Pursuant to the Asset Purchase Agreement dated as of January 19, 2010 (the "Purchase Agreement"), by and among DOUGHERTY FUNDING LLC, a Delaware limited liability company ("**Purchaser**") and KLCG PROPERTY, LLC, a Delaware limited liability company ("**KLCG Property**"), and GURNEE PROPERTY, LLC, an Illinois limited liability company ("**Gurnee Property**"; collectively, "**Sellers**"), these schedules are being delivered by Sellers to Purchaser. Each capitalized term used herein shall have the meaning assigned to it in the Agreement unless otherwise defined herein.

The section numbers below correspond to the section numbers of the representations and warranties in the Purchase Agreement which are modified by the disclosures contained in the Schedules; *provided*, *however*, that any information disclosed herein under any section number shall be deemed to be disclosed and incorporated in any other section of the Purchase Agreement or the Schedules where such disclosure would be reasonably apparent on the face of such disclosure.

To the extent that any representation or warranty contained in the Purchase Agreement is limited to or qualified by the materiality of the matters to which the representation or warranty is given, the inclusion of any matter in the Schedules do not constitute a determination that such matters are material. The disclosure of a particular item of information in the Schedules will not be an admission of any liability or obligation by the Sellers, to any third party or any admission against the interest of the Sellers.

| Schedule | Title |
|----------|-------|
| 5.6 | Employee Controversies |
| 5.7 | Collective Bargaining Agreements and Employment Contracts |
| 5.9 | Environmental Exceptions |
| 5.14 | Permits |
| 5.15 | Litigation |
| 5.16 | Taxes |

## SCHEDULE 5.6

### Employee Controversies

[EEOC Complaint filed against KLCG Property]

# SCHEDULE 5.7

## Collective Bargaining Agreements and Employment Contracts

**None**

# SCHEDULE 5.9

## Environmental Exceptions

None

# SCHEDULE 5.14

## Permits

1.   Permit Application for Commercial or Industrial Service Connection issued by the North Shore Sanitary District as Permit No. 25-301-C.

2.   Building Permit issued by the City of Gurnee, Illinois in connection with the Facility, Permit No. 39115.

3.   Certificate of Occupancy issued by the City of Gurnee, Illinois on December 19, 2006.

4.   Liquor license issued by the City of Gurnee, Illinois, dated _____, 20__, expiring on _____, 20__.

5.   Elevator, food service, etc. [Sellers to supply copies of all Permits]

# SCHEDULE 5.15

## Litigation

1.  EEOC Claim brought by _____, against KLCG Property and S&L Management Company, dated _____, 2009.

2.  [Property Tax issue within school district]

## SCHEDULE 5.16

### Taxes

Taxes which are the responsibility of Sellers to pay prior to the Date of Closing:

1.      Real Estate taxes for 2008, in the approximate amount of $832,826.00 with additional interest, penalties, fees and costs accruing thereon and with respect to the redemption thereof;

2.      Water taxes due the City of Gurnee for the period prior to the Closing Date;

3.      Hotel/hospitality taxes due the City of Gurnee for the period prior to the Closing Date.